IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DOUGLAS DYNAMICS, LLC,

                    Plaintiff,                        OPINION AND ORDER

   v.

                                                      09-cv-261-wmc

BUYERS PRODUCTS COMPANY,

                    Defendant.

---

      In deciding the parties' summary judgment motions in this patent infringement case, the court determined that defendant Buyers Products Company's products did not infringe plaintiff Douglas Dynamics, LLC's "pioneering" patent, United States Patent No. 35,700 (the '700 patent), but that six of defendant Buyers' snowplow assemblies directly infringed claims 1, 3-5 and 7 of plaintiff Douglas's United States Patent No. 5,353,530 (the '530 patent) and claims 28-31, 35-36 and 53-57 of Douglas's United States Patent No. 6,944,978 (the '978 patent).[1]  (Dkt. #332.)  In addition, the court rejected Buyers' invalidity claims as to the '978 patents on summary judgment and a jury later found that the asserted claims of the '530 patent were not invalid.  After trial, Douglas moved this court for an injunction permanently enjoining Buyers from producing and selling snowplow assemblies found to have infringed the specific claims above.  Because Douglas has failed to prove that it is entitled to injunctive relief on this record, its motion will be denied.

---

[1]  The court also found the assemblies contributed to and induced the infringement of claims 58 and 59 of the '978 patent.  (*Id.*)

<u>OPINION</u>

Under 35 U.S.C. § 283, a court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."   Before the court can grant a permanent injunction pursuant to § 283, the Federal Circuit has articulated a four-factor test that Douglas must satisfy:

> (1) it has suffered an irreparable injury; (2) remedies available at law are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.

*i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  Here, Douglas has failed to make even a threshold showing of irreparable harm or of the inadequacy of a monetary damage award.  Even if satisfaction of these two, overlapping factors were a closer question, Douglas also fails to prove that a balancing of hardships or the public interest militates towards entry of a permanent injunction.  On the contrary, the record in this case suggests a permanent injunction is both ill-advised and unnecessary.

**A.  Irreparable Injury and Remedy at Law**

Douglas contends that it has suffered, and will continue to suffer, irreparable injury because (1) Buyers is a "direct competitor"; (2) Douglas's reputation, brand recognition and goodwill in the marketplace will be damaged; and (3) Douglas's investment in the technology of the '530 and '978 patents will be lost.  A review of the

2

record, however, shows a lack of any irreparable injury, as well as that a reasonable royalty would adequately compensate Douglas for Buyers' infringement.

1.  Claimed Tangible Losses from Buyers' Competition

Douglas points out that the parties are direct competitors in a highly-competitive, open market, where customers have essentially an equal opportunity to purchase either a Douglas or a Buyers snowplow.  Certainly the record establishes that the parties here compete for sales of snowplow truck assemblies, along with a number of other manufacturers.  How directly or intensely the parties compete, however, is less clear.  For starters, the evidence at trial established that the parties' snowplow assemblies are hardly fungible.   At least to date, the parties' competition can be likened to that of Mercedes Benz and Ford, with Douglas's snowplows being like the former and Buyers' the latter.  While both car companies compete in an open market for sedan-style cars, it is unlikely someone in the market for a Mercedes Benz S550 would also consider purchasing a Ford Taurus, or vice versa.  The gap between Douglas's snowplows and Buyers' snowplows may not be perfectly comparable to this car analogy, the basic idea is the same:  both anecdotal and statistical evidence at trial established a customer going to buy a Douglas snowplow would most likely not decide to purchase a Buyers snowplow instead.

Ultimately, Douglas has proven nothing more than that it competes in the same general snowplow market as Buyers, but this fact alone is not sufficient to establish irreparable harm.  In *i4i Limited Partnership*, the Federal Circuit upheld the district court's

finding that the patent holder had suffered an irreparable injury because the parties were direct competitors *and* the patent holder had lost market share.  598 F.3d at 861.  Past harm to "market share, revenues, and brand recognition" was particularly relevant to determining whether the patentee suffered an irreparable injury rather than merely whether they compete in the same market. *Id.*

Virtually all of the hard data introduced at trial contradicts Douglas's claim that Buyers is one of its three main competitors, along with Boss and Meyer, much less that allowing Buyers to continue infringing its minor patents would result in irreparable harm. First, Douglas grossly overstated the impact of competition from Buyers to date. Between 2007 (when Buyers first entered the snowplow market) and 2010, Douglas has maintained its market share of approximately 60%, Boss's share has been about 20%, and Meyer's around 10%.  (*See* Janik Depo., dkt. #233, at 26-28.)  Conversely, Buyers was estimated to have only a 5% market share of the snow plow market as of 2010. (Watson Depo., dkt. #232, at 72-73.)  Based on market share data at least, Buyers may be among Douglas's three "main" competitors, but it is by far the smallest.  Further, since Buyers introduced its snowplows into the market in 2007, Douglas's relative market share actually *increased* by about 1% a year.

The bottom line is that Buyers' entry into the snowplow market has not resulted in any quantifiable lost market share or profits for Douglas.  Indeed, Douglas was unable to point to a *single* lost customer sale to Buyers.  An improving or at least stable market share, and an absence of any actual lost sales, weighs heavily against finding that Douglas has suffered irreparable harm by virtue of Buyers' ongoing infringement of the '530 and

'978 patents.  *See Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1329 (Fed. Cir. 2008) (plaintiff's showing of lost market share resulting from defendant's infringement supported its argument that defendant's continued infringement would result in irreparable injury).  Moreover, given the lack of any meaningful inroads, Douglas offers no credible reason why a monetary award, in the form of a reasonable royalty, could not remedy any continuing infringement.

   2.  Claimed Intangible Losses from Buyers' Competition

   Douglas's argument that its reputation, brand recognition and goodwill in the marketplace has been or will be damaged is also without support in the record. Specifically, Douglas offered no evidence that Buyers' use of the patented technology in the '530 or '978 patents ever caused a customer to believe that Buyers' snowplows were somehow connected with, or a version of, Douglas's snowplows.  On the contrary, the distributor surveys introduced at trial established that the quality of Buyers' snowplows was not good at best (*see* Trial Tr., dkt. #512, at 4-40, lns. 20-23; 4-42, lns. 17-19; 4-43, lns. 14-17), and that the quality of Douglas's brands of snowplows were considered among the best (*see id.*, dkt. #512, at 4-42, lns. 6-8, 14-15; 4-43, ln. 7).

   This evidence confirms that distributors selling snowplow assemblies and the customers buying them readily differentiated between the two brands based principally on quality.  These surveys further revealed that in the snowplow industry Douglas is recognized as producing good quality, innovative snowplows and Buyers is recognized as producing a less expensive, poorer quality snowplow.  In other words, there is simply no

evidence that Douglas's reputation, brand or goodwill in the snowplow market was or will be damaged by Buyers' sale of its remaining, infringing snowplows.

This is simply not a case like *i4i Limited Partnership*, which involved a small-company patentee directly competing with an enormous, market and profit stealing infringer -- Microsoft.   598 F.3d at 862.   In that case, Microsoft was not merely producing an infringing product competing with the patentee's product, but Microsoft's product rendered the patentee's product obsolete, requiring the patentee to change its entire business model.  *Id.* at 861.  The undeniable result was a loss of market share, brand recognition and goodwill because the patentee simply could not compete with the ubiquitous Microsoft.  *Id.* at 862.  By contrast, Douglas not only sits in the position of power in the snowplow market, but from the record is not struggling to sell its snowplows since Buyers' entry into the market with infringing snowplows.

   3.  Douglas's Claim of Lost Investment

Finally, Douglas argues unpersuasively that its investment in the technology of the '530 and '978 patents will be lost if Buyers is not permanently enjoined from infringing further.  First, any loss of investment can be repaid with a reasonable royalty.  Second, the patents both involve what Douglas contemporaneously viewed as minor improvements to its existing detachable snowplow technology, undercutting its current argument that a great investment was required to develop them.

While Douglas contends that the '530 patent was a major improvement in the way snowplows were quickly mounted and dismounted from a vehicle by teaching the

use of an A-frame connected to a lift frame, Douglas did not even make this contention until after the court distinguished between how (1) Douglas's non-infringed '700 patent requires that the snowplow's A-frame be connected to mount frame and (2) the '530 patent claims a snowplow with an A-frame connected to the lift frame. (*See* Ct. Order, dkt. #332.) Prior to that order, Douglas described both the '530 patent and the '978 patent as claiming secondary features or "minor improvements" to the invention claimed in its pioneering '700 patent. (*See* Trial Tr., dkt. #514, at 23 (Douglas's damage expert testified that the two patents at issue were "minor improvements upon essentially this pioneering patent. They would represent an incremental improvement upon the '700 patent technology.").)

Douglas's earlier position is by far the more credible one. Regardless of what Douglas would argue now, the manner in which the A-frame connects to the lift frame in the '530 patent is not the innovative feature of the patent; instead, it is the "releasably connecting means" for quick and easy attachment and detachment of the snowplow as a single unit. *See* '530 pat., col. 6, lns. 26 & 31. The '530 patent requires this "releasably connecting means" to use a U-shaped channel and an arm that fits in the channel. *Id.*, col. 6, ln. 31-37. In other words, a type of tongue and groove set-up where the groove -- U-shaped channel -- is such that it will help guide the tongue into place to quickly mount the snowplow on the vehicle. This is an incremental improvement to Douglas's more fundamental, and much more highly touted, invention permitting easy detachment of a snowplow from a truck as an entire unit in a fast and efficient manner by use of a lift frame supported by an A-frame.

Because use of a U-shaped channel structure for attaching a snowplow to a truck, though patentable, is not a major advancement, there is always the reasonable possibility of a simple design-around.  Here, the court found Buyers' initial attempt at a design-around the '530 patent failed, resulting in this patent infringement suit.  Buyers represents that it has now stopped manufacturing infringing snowplows and is prepared to transition to a new design-around snowplow.  (*See* Def.'s Opp. Br., dkt. #526, at 5 and 24.)

Similarly, the '978 patent's innovative structure is a latch lever used for quick attachment or detachment of the snowplow to the vehicle.  '978 pat., abstract.  Like the '530 patent, the '978 patent is a minor improvement on the detachable snowplow.  Simply remove or alter in a substantial manner the latch lever claimed in the '978 patent and Buyers' snowplow would no longer infringe.

Because these inventions are but small components on the larger snowplow, and because Douglas appears to have suffered no quantifiable monetary or non-monetary damages, a remedy at law in the form of a reasonable royalty is the more suitable remedy over a permanent injunction.  In any event, Douglas has failed to show otherwise.  *See eBay Inc.*, 547 U.S. at 396-97 (J. Kennedy concurring) ("When the patented invention is but a small component of the product the companies seek to produce and the threat of an injunction is employed simply for undue leverage in negotiations, legal damages may well be sufficient to compensate for the infringement and an injunction may not serve the public interest.").

Entering the injunction requested by Douglas would in essence require Buyers to junk some or most of its snowplow business, at least until a work around can be established, simply because they infringe minor improvements taught in Douglas's '530 and '978 patents.  As Douglas points out, "one who elects to build on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."  *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986).  Nonetheless, entering the requested permanent injunction under the facts in this case would be supported solely by the fact that Buyers is violating Douglas's right to exclude others from infringing its minor patents.  This violation alone is not enough to support the entry of a permanent injunction.  *eBay Inc.*, 547 U.S. at 392.  Instead, compliance with the well-established principles of equity is required and it is those principles Douglas has failed to satisfy.

Even assuming that Buyers may have caused some damage to the intangible assets represented by Douglas's patents, or less likely to Douglas's bottom line, nothing has been offered into evidence to establish that this damage could not be remedied by a reasonable royalty.

## B.  Balance of Hardships and Public Interest

When balancing the hardships between the parties, the result is, at best, a wash for Douglas.  As explained, the infringed patents provide minor improvements that Buyers maintains can be easily designed around.  Thus, except for having to junk its unsold stock of infringing snowplow assemblies, the hardship suffered by Buyers if a

permanent injunction were entered would be minimal, assuming such an easy design around could be readily implemented, though it may be stuck with unsold, infringing inventory or the cost of a refit.

The balance does not, however, tip in favor of Douglas because it would suffer no great hardship should an injunction not issue.  As reviewed in more detail above, the evidence strongly suggests customers are not buying Buyers' snowplows because they use the improvements taught in Douglas's '530 and '978 patents.  Although the patents improve the snowplow assemblies, Douglas is not losing market share or profits as a result of Buyers' entrance into the snowplow market with products using these minor improvements, nor does it appear to damage in some other respect Douglas's use of the minor improvement.

Turning to the public interest, the parties agree that this is a concentrated industry, with Douglas by far the largest company.  Accordingly, the public may well be better served by having a new competitor, selling cheaper snowplow assemblies in what appears may be an untapped market segment, at least by the three leading manufacturers.

It is true, as Douglas points out, that the public also has an interest in the judicial protection of patent rights.  When the infringed patents, however, teach an invention that is merely a small part of a larger product -- and a non-essential part at that -- and the infringing larger product is introduced to reach a portion of the market untapped by the patent holder, the public interest may well be best served by permitting the new competitor to remain in the market.  *See eBay Inc.*, 547 U.S. at 396-97 (J. Kennedy

concurring) (public interest not served by injunction when patented invention is only small component of the larger product).

Accordingly, Douglas has established a right to a reasonable royalty for Buyers' continued infringement of the '530 and '978 patents, but not to a permanent injunction.

## C. Reasonable Royalty

In setting a reasonable royalty, the Federal Circuit has provided the following advice for district courts:

> In most cases, where the district court determines that permanent injunction is not warranted, the district court may wish to allow the parties to negotiate a license amongst themselves regarding future use of a patented invention before imposing an ongoing royalty. Should the parties fail to come to an agreement, the district court could step in to assess a reasonable royalty in light of the ongoing infringement.

*Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1315 (Fed. Cir. 2007).

Hopefully by now, the parties have attempted in good faith to reach, if not reached, a reasonable royalty rate. This court will nevertheless give the parties a brief, further opportunity to negotiate a license for Buyers' use of the '530 and '978 patents. The parties have, therefore, until March 28, 2011, to enter into a licensing agreement or to each file a brief supporting their proposed reasonable, ongoing royalty figures. If necessary, the court will use those submissions to determine an appropriate reasonable ongoing royalty.[2]

---

[2] Notwithstanding the court's ruling today, this ongoing royalty is likely to be higher than the royalty arrived at by the jury. First, the evidence at trial established that but for a court-ordered royalty Douglas would not have allowed Buyers to use either patent, regardless of price. Second, the ongoing royalty is set with absolute certainty that

ORDER

IT IS ORDERED that:

(1)     Plaintiff Douglas Dynamics's motion for a permanent injunction (dkt. #518) is DENIED.

(2)     The parties have until March 28, 2011, in which to reach a licensing agreement for defendant Buyers Products' use of plaintiff's U.S. Patents Nos. 5,353,530 and 6,944,978 or to file their separate positions for the court to use in assessing the appropriate reasonable ongoing royalty.

Entered this 25th day of February, 2011.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

Buyers' snowplows infringe Douglas's '530 and '978 patents. Accordingly, Buyers' statement that any ongoing royalty "should be set at the rate determined by the jury" is simply wrong. *See Paice LLC*, 504 F.3d at 1317 (J. Rader concurring) ("[P]re-suit and post-judgment acts of infringement are distinct, and may warrant different royalty rates given the change in the parties' legal relationship and other factors."). Of course, other factors (many noted in this decision) mitigate just how high Buyers would go, even in a theoretical licensing agreement.