IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| DOUGLAS DYNAMICS, LLC, | |
| Plaintiff, | CIVIL ACTION NO.: 3:09-CV-00261 |
| vs. | JUDGE CONLEY |
| BUYERS PRODUCTS COMPANY, | |
| Defendant. | |

**DEFENDANT BUYERS' MOTION TO EXCLUDE
THE TESTIMONY OF RICHARD BERO**

# Contents

I.    Background Of Argument ................................................................................................1

II.   Relevant Law ................................................................................................................2

III.  Bases for Excluding Mr. Bero's Opinions ..................................................................5

    A.    Bero Is Not Qualified To Testify That The '700 Patent Is A So-Called "Pioneering Patent" ....................................................................................5

    B.    Bero's Opinion That Douglas Would Be Entitled To Lost Profits Is Not Reliable Or Helpful To The Trier Of Fact ..............................................6

          1.    Bero's Methodology For Determining The Market Share To Which Douglas Would Be Entitled In A "But For" World Is Arbitrary ................6

          2.    Bero's Methodology for Determining Market Demand for the '700 Patent Is Not Reliable or Helpful to the Trier of Fact ...............................11

    C.    Bero's Opinion that a Reasonable Royalty Would Be 11.7% Is Not Reliable or Helpful to the Trier of Fact ...............................................................14

          1.    Bero's Methodology for Determining the Royalty Base Is Not Accepted or Reliable and Violates the Entire Market Value Rule ...........14

          2.    Bero's Methodology for Determining a Starting Royalty Is Not Accepted or Reliable and Violates the Entire Market Value Rule ...........16

          3.    Bero's Apportionment of an 11.7% Royalty to the '700 Patent is Arbitrary ......................................................................................................18

IV.  Conclusion ..................................................................................................................20

# Table Of Authorities

## Cases

*Apple, Inc. v. Motorola, Inc.*,
 2012 WL 1959560 (N.D. Ill. May 22, 2012) ............................................................. 8

*BIC Leisure Products, Inc. v. Windsurfing Intern., Inc.*,
 1 F. 3d 1214 (Fed. Cir. 1993) ................................................................................... 8

*CDW LLC v. NETech Corp.*,
 906 F. Supp. 2d 815 (N.D. Indiana 2007) .............................................................. 9

*Cornell Univ. v. Hewlett-Packard Co.*,
 609 F.Supp. 2d 279 (N.D. N.Y. 2009) .................................................................... 17

*Daubert v. Merrell Dow Pharm., Inc.*,
 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ......................................... 3

*Dynetix Design Solutions, Inc. v. Synopsys, Inc.*,
 2013 WL 4538210 (N.D. Cal., Aug. 22, 2013) ...................................................... 17

*Emigh v. Consol. Rail Corp.*,
 710 F.Supp. 608 (W.D.Pa.1989) ............................................................................. 5

*Ervin v. Johnson & Johnson, Inc.*,
 492 F.3d 901 (7th Cir. 2007) .................................................................................. 4

*Fail-Safe, LLC v. AO Smith Corp.*,
 744 F. Supp. 2d 870 (E.D. Wisc. 2010) ................................................................. 10

*Fractus, S.A. v. Samsung*,
 No. 6:09-cv-203-LED-JDL, 2011 WL 7563820 (E.D. Tex. Apr. 29, 2011) ........... 14

*Garretson v. Clark*, 111 U.S. 120 (1884) ..................................................................... 14

*General Electric Co. v. Joiner*,
 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ......................................... 12

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
 185 F.3d 1341 (Fed.Cir.1999) ................................................................................. 4

*Hynix Semiconductors, Inc. v. Rambus, Inc.*,
 2006 WL 1991760 (N.D.Cal., July 14, 2006) ........................................................ 20

*IP Innovation LLC v. Red Hat, Inc.*,
 705 F.Supp. 2d 687 (E.D. Tex. 2010) ..................................................................... 4

*King-Indiana Forge King-Indiana Forge,*
 2009 WL 3187685 (S.D.Ind.2009) ........................................ 10

*Kumho Tire Co., Ltd. v. Carmichael,*
 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ............ 3

*Lewis v. CITGO Petroleum Corp.,*
 561 F.3d 698 (7th Cir. 2009) .............................................. 4

*Micro Chem., Inc. v. Lextron, Inc.,*
 317 F.3d 1387 (Fed. Cir. 2003) ............................................ 3

*Oracle Am., Inc. v. Google Inc.,*
 2011 WL 2976449 (N.D.Cal. Jul. 22, 2011) .......................... 16

*People Who Care v. Rockford Board of Educ.,*
 111 F.3d 528 (7th Cir.1997) ................................................ 10

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
 711 F.3d 1348 (Fed. Cir. 2013) ............................................ 3

*Rembrandt Social Media, LP v. Facebook, Inc.,*
 2013 WL 6327852 (E.D. Va., December 3, 2013) .................. 17

*Riles v. Shell Exploration & Production Co.,*
 298 F.3d 1302 (Fed.Cir.2002) ............................................ 5

*Sun Studs, Inc. v. ATA Equipment Leasing, Inc.,*
 872 F. 2d 978 (Fed. Cir. 1989) ............................................ 6

*Target Market Publishing, Inc. v. ADVO, Inc.,*
 136 F.3d 1139 (7th Cir.1998) .............................................. 9

*Texas Instruments, Inc. v. US Intern. Trade Com'n,*
 846 F. 2d 1369 (Fed. Cir. 1988) .......................................... 6

*Uniloc USA, Inc. v. Microsoft Corp.,*
 632 F.3d 1292 (Fed. Cir. 2011) ............................................ 2

*United States v. Mamah,*
 332 F.3d 475 (7th Cir. 2003) .............................................. 14

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.,*
 395 F.3d 416 (7th Cir. 2005) .............................................. 10

*ZF Meritor LLC v. Eaton Corp.,*
 646 F. Supp. 2d 663 (D. Del. 2009) .................................... 11

Defendant Buyers Products Company ("Buyers") respectfully submits this motion to exclude the testimony of Plaintiff Douglas Dynamics, LLC's ("Douglas'") damages expert, Richard Bero.

Federal Circuit case law regarding admissible expert damage testimony makes it clear that the damages awardable for patent infringement must be tied to the actual invention at issue. Mr. Bero's analysis proceeds as if Douglas had been the first to invent the snow plow, ignoring the fact that the '700 patent is only one of four to thirteen patents owned by Douglas that cover its plows, ignoring that other non-infringing plow designs have achieved commercial success, ignoring the fact that other patents have already been identified by Douglas as important to the "easy" attachment and removal of its plow, and ignoring the fact that Mr. Bero's own interviews show that other facts, such as brand name, service and price drive customer interest in the plow along with the attachment systems.

Other flaws permeate Mr. Bero's analysis, from reliance on surveys that have been repudiated by the Federal Circuit, to unexplained and unjustified counterfactual assumptions about market share, all of which are set out in detail in this Brief. It would be error to permit Mr. Bero to testify to the opinions stated in his report.

## I.    Background Of Argument

In 2010, Mr. Bero evaluated the patents then at issue in groups, based on a general description of the relevant technology, instead of assessing the patents on an individual basis. He included the patent currently at issue, RE 35700 ("the '700 Patent"), as part of the "attachment/detachment" patents that allegedly cover Douglas' "easy on/easy off" snowplow attachment/detachment system. When given an opportunity to correct this oversight post-remand, Mr. Bero again declined to independently value the '700 Patent. Instead, he merely

subtracted the royalties determined by the jury on the other attachment/detachment patents asserted by Douglas from the initial royalty figure he had proposed. *See* Exhibit A, Jan. 17, 2014 Second Supplemental Bero Report at 4-5.[1] To support both his lost profits and reasonable royalty analysis, Mr. Bero continues to rely solely on generic evidence relating to snowplow attachment/detachment systems, instead of evidence specifically related to the technology of the '700 Patent.

Both Mr. Bero's lost profits and his reasonable royalty analyses are fatally deficient in that they fail to provide evidence tailored to the patent at issue – the '700 Patent – and the specific benefits and advantages it offers. <u>The sole fact he cites in support of his valuation is his unsupported and unqualified opinion that the '700 Patent is a "pioneer" patent</u> and, thus, the sole basis for purchaser demand for Douglas snowplow systems that Douglas claims are covered by anywhere from four to thirteen patents. Mr. Bero's reasonable royalty analysis is infected by his reliance on a 1997 LES NOUVELLES survey that has been soundly rejected by the Federal Circuit and other courts. Under any reasonable interpretation of the relevant legal precedents, Mr. Bero's opinions are woefully inadequate and violate the basic requirements for expert testimony of patent damages: (1) the damages must be tied to the invention and (2) damages must be supported by sound, economic proof. For failing to follow a reliable damages methodology, Mr. Bero's testimony and opinions regarding the value of the '700 Patent must be excluded from trial.

## II.    Relevant Law

It is well settled that in patent infringement cases, "[t]he patentee bears the burden of proving damages." *Uniloc USA, Inc. v. Microsoft Corp*., 632 F.3d 1292, 1315 (Fed. Cir. 2011).

---

[1] The Exhibits to this Motion are attached to the Declaration of Christina J. Moser, Esq., submitted concurrently herewith.

"In determining damages, a jury may rely on expert testimony." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1373 (Fed. Cir. 2013). District courts, as gatekeepers, must nevertheless ensure that all expert testimony is rooted in firm scientific or technical ground. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). To that end, the Federal Rules of Evidence require that an expert's testimony be the product of reliable principles and methods applied to sufficient facts or data. Fed.R.Evid. 702(b),(c). The trial judge must ensure that the expert has "reliably applied the principles and methods to the facts of the case." *Id.* at 702(d).

"Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law." *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003). Therefore, regional circuit law governs, and the Seventh Circuit has set forth a three-step analysis for addressing relevance and reliability:

> (1) the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702; (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592-93; and (3) the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702.

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). In determining reliability, courts are to consider the following non-exhaustive list of guideposts: "(1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has been generally accepted in the scientific community." *Ervin,* 492 F.3d at 904 (citing *Daubert*, 509 U.S. at 593-94). "The proponent of the expert bears the burden of demonstrating that the expert's testimony satisfies the *Daubert* standard," by the preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

To properly carry its burden of proving damages, "the patentee must 'sufficiently [tie the expert testimony on damages] to the facts of the case.'" *Uniloc*, 632 F.3d, at 1315 (quoting *Daubert*, 509 U.S. at 591). "The Federal Circuit 'requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture.'" *IP Innovation LLC v. Red Hat, Inc.*, 705 F.Supp. 2d 687, 689 (E.D. Tex. 2010) (Federal Circuit Chief Judge Rader sitting by designation), quoting *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed.Cir.1999). "Although some approximation is permitted in calculating the reasonable royalty, the Federal Circuit requires 'sound economic and factual predicates' for that analysis. *Riles v. Shell Exploration & Production Co.*, 298 F.3d 1302, 1311 (Fed.Cir.2002) (citation omitted). Where sound economic and factual predicates are absent from a reasonable royalty analysis, Rule 702 requires exclusion of the proffered evidence. *IP Innovation*, 705 F.Supp. 2d at 689.

"[W]hile an expert's data need not be admissible, the data cannot be derived from a manifestly unreliable source." *Power Integrations*, 711 F.3d at 1373. "Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are `of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Daubert*, 509 U.S. at 595 (quoting Fed. R. Evid. 703). "[U]nreliable testimony frustrates a primary goal of expert testimony in any case, which is meant to place experience from professional specialization at the jury's disposal, not muddle the jury's fact-finding with unreliability and speculation.." *Power Integrations*, 711 F.3d at 1374; *see Emigh v. Consol. Rail Corp.*, 710 F.Supp. 608, 612 (W.D.Pa.1989) ("[W]hen the underlying source is so unreliable as to render it more prejudicial than probative, ... Rule 703 cannot be used as a backdoor to get the evidence before the jury.").

In this case, the concern is not "shaky but admissible evidence" but the complete lack of reliable evidence tying Mr. Bero's analysis to the facts of the case. These errors, which permeate Mr. Bero's anticipated testimony based on his expert reports, deposition, and prior testimony, require exclusion of Mr. Bero's testimony at trial.

## III. Bases for Excluding Mr. Bero's Opinions

### A. Bero Is Not Qualified To Testify That The '700 Patent Is A So-Called "Pioneering Patent"

There is no dispute that Mr. Bero is not an engineer, and has no personal experience in designing snowplows. Yet, he opines that the '700 Patent is a "pioneer patent," without identifying what qualifies a patent, legally speaking, as "pioneering." *See* Exhibit B, Aug. 25, 2010 Bero Report at 61-62; ECF 334, Bero Dep. at 142-143; ECF 510, Bero trial testimony, v. 3-C at 31; Exhibit A, Jan. 17, 2014 Second Supplemental Bero Report at 4.

According to the Supreme Court:

> This word ["pioneer"], although used somewhat loosely, is commonly understood to denote ***a patent covering a function never before-performed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art***, as distinguished from a mere improvement or perfection of what had gone before. Most conspicuous examples of such patents are: The one to Howe of the sewing machine; to Morse of the electrical telegraph; and to Bell of the telephone.

*Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 561-62 (1898) (defining "pioneer" patent) (emphasis added). Clearly, Douglas' patent on an improved attachment method for the well-known snowplow is not the equivalent of a patent that newly describes the sewing machine, the electrical telegraph, or the telephone. Moreover, the jurisprudence does not recognize a special category of "pioneer" patents for the purpose of awarding disproportionate royalties; rather, the distinction appears relevant only to the scope of the claims and their proper

equivalents. *See, e.g.*, *Sun Studs, Inc. v. ATA Equipment Leasing, Inc.*, 872 F. 2d 978, 987 (Fed. Cir. 1989); *Texas Instruments, Inc. v. US Intern. Trade Com'n*, 846 F. 2d 1369 (Fed. Cir. 1988).

It is undisputed that Douglas did not invent snowplows. It is also undisputed that the '700 Patent cites a long list of prior art, and that the '700 Patent is not the only method for providing a "quick and easy" snowplow attachment/detachment system. *See* Exhibit B, Aug. 25, 2010 Bero Report at 27-28, 32-33. In any event, Mr. Bero is not qualified to make a determination regarding where the '700 Patent fits in the overall prior art. He is not an engineer, nor does he have experience designing snow plows. To the extent the question of whether the '700 Patent is "pioneer" is relevant to the jury's determination at trial, Mr. Bero is not qualified to be the person to be opining on the subject. Indeed, no expert identified by Douglas has presented a report containing the opinion that the '700 patent is "pioneering" and the basis for that opinion; the time for filing any such report has, of course, long since passed.

Accordingly, any testimony by Mr. Bero regarding whether or not the '700 Patent is a "pioneer" patent – or similar language to that effect – should be excluded, as should his damage conclusions, all of which rely at their foundation on this flawed assumption.

**B.    Bero's Opinion That Douglas Would Be Entitled To Lost Profits Is Not Reliable Or Helpful To The Trier Of Fact**

**1.    Bero's Methodology For Determining The Market Share To Which Douglas Would Be Entitled In A "But For" World Is Arbitrary**

It is well-settled that lost profits analyses "[require] sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture" for damages calculations. *Grain Processing Corp.*, 185 F.3d, at 1350. Mr. Bero's expert reports, however, are bereft of any analysis – let alone sound economic proof – regarding the structure of the snowplow market without the infringing Buyers snowplows. He simply notes that Douglas'

market share with the infringement is an estimated ▮% of the market, and assumes that Douglas would thereby have captured at least ▮% of Buyers' sales in the hypothetical market. *See* Exhibit B, Aug. 25, 2010 Bero Report at 45. Although the Federal Circuit allows patentees to prove lost profits within a defined market share, the law still requires proof of what the market share would be in a hypothetical world "but for" the infringement. *BIC Leisure Products, Inc. v. Windsurfing Intern., Inc.*, 1 F. 3d 1214 (Fed. Cir. 1993). Moreover, "[t]he alternative-universe approach must take account of alternatives the alleged infringer would have embraced in order to avoid a trip to that universe." *Apple, Inc. v. Motorola, Inc.*, 2012 WL 1959560, *12 (N.D. Ill. May 22, 2012), *citing Grain Processing*, 185 F.3d at 150-51.[2] "[O]nly by comparing the patented invention to its next-best available alternative(s) — regardless of whether the alternative(s) were actually produced and sold during the infringement — can the court discern the market value of the patent owner's exclusive right, and therefore his expected profit or reward, had the infringer's activities not prevented him from taking full economic advantage of this right." *Grain Processing*, 185 F.3d at 1351.

Despite noting lower-priced competitors in the market and despite dealer market share estimates that differ significantly from Douglas' internal estimates,[3] Mr. Bero assumes that Douglas would maintain its ▮% market share if Buyers' infringing plows were not on the market (and then, without explanation, reduces that ▮% to ▮% later in his report). All of Mr. Bero's interview subjects who mention the relative merits of the attachment/detachment system s surmise that Buyers' attachment/detachment system is less user-friendly – which indicates that Buyers' purchasers are less concerned about the attachment/detachment system and that the '700

[2] Unpublished decisions are included in the Appendix of Unpublished Decisions attached to the Declaration of Christina J. Moser, Esq., submitted concurrently herewith.
[3] *See* Exhibit B, Aug. 25, 2010 Bero Report, Schedules 23.10 and 20.1, and 21.0.

patent technology used in the Buyers plows does not provide the benefit that is attractive to purchasers. *See* Exhibit B, Aug. 25, 2010 Bero Report, Schedule 21.0, Interviewees 2, 3, and 5. Other respondents disagreed about the importance of the attachment/detachment system. One noted, without prompting that "████████████████████████████████████████████ ████████████████████ 7.[4] *Id.*, Interviewee 7. Other respondents agreed, again, unprompted, that price makes a difference. *Id.*, Interviewees 5 and 9. One respondent noted that ████████████████████████████████████████████████████████████████ ██████████████ *See* Exhibit B, Aug. 25, 2010 Bero Report, 33. Mr. Bero did not acknowledge the impact of any of this data on his analysis of what would happen in a "but for" world. Similarly, Mr. Bero admits that designing around the '700 Patent would increase the cost of the plow assembly approximately ███████, but does not analyze the impact the relatively low design-around cost would have on either the "but for" market or the parties' hypothetical royalty negotiation. *See id.* at 60.

When an expert's opinion fails to account for obvious "salient explanatory variables," it is too unreliable for admissibility under Rule 702. *CDW LLC v. NETech Corp.*, 906 F. Supp. 2d 815, 827 (N.D. Indiana 2007), *citing Target Market Publishing, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143-44 (7th Cir.1998) (rejecting expert opinion resting on implausible assumptions); *King-Indiana Forge King-Indiana Forge,* 2009 WL 3187685 at *3 (S.D.Ind.2009) (*quoting People Who Care v. Rockford Board of Educ.*, 111 F.3d 528, 537-38 (7th Cir.1997) (study that "`fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal

---

[4] It also appears that Mr. Bero did not differentiate between U.S. and Canadian markets for the purpose of his analysis, as at least one of his interview subjects is based in Canada. *See* Exhibit B, Aug. 25, 2010 Bero Report, Schedule 21.0

court'"")). An expert cannot cherry-pick facts that support his opinion and simply ignore those that do not. *Fail-Safe, LLC v. AO Smith Corp.*, 744 F. Supp. 2d 870, 889-891 (E.D. Wisc. 2010). Like the expert whose opinion was excluded in *Fail-Safe*, Mr. Bero's general platitudes about the strength of Douglas' presence in the market, while failing to take into account economic issues facing the market in a "but for" world, renders his opinion inherently unreliable. *Id.* at 892.

Moreover, the Seventh Circuit has held that an assumption based on the internal projections of the expert's sponsor lacks the reliability demanded by Rule 702. *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (a party's "internal projections ... rest on its say-so rather than a statistical analysis," and "represent hopes rather than the results of scientific analysis"); *see also ZF Meritor LLC v. Eaton Corp.*, 646 F. Supp. 2d 663, 667 (D. Del. 2009) (excluding testimony of expert who "did not apply his own assumptions, based upon his expertise, to any financial data in order to project" the party's future performance, but who instead "relied on" the party's own internal financial projections "without knowing ... the validity of the underlying data and assumptions upon which the [projections] were based"). Mr. Bero's opinion that Douglas would capture a certain portion of the market, based on Douglas' internal projections, is incompetent.

In *BIC Leisure Products*, the Federal Circuit reversed a damages award that merely awarded the patentee its pro rata share of the market for each year of the damages period – the same simplistic analysis engaged in by Mr. Bero. 1 F.3d at 1217. In *BIC*, like here, the alleged infringer participated at the market's entry level, while the patentee's customers typically sought products at a higher price range. *Id.* at 1218. Also in *BIC*, like here, competitors offered products at prices between the two parties and in the same distribution channels. The fact that the patentee's market share was not affected by the infringer also was relevant to the court in

*BIC*.  *Id.* (patentee continued to lose sales after the infringer exited the market).  The court explained, "If the patentee's and the infringer's products are not substitutes in a competitive market, *Panduit*'s first two factors do not meet the 'but for' test — a prerequisite for lost profits."  The court noted that the first *Panduit* factor "presupposes that demand for the infringer's and patent owner's products is interchangeable."  *Id.* at 1219.  "If the products are not sufficiently similar to compete in the same market for the same customers, the infringer's customers would not necessarily transfer their demand to the patent owner's product in the absence of the infringer's product."  *Id.*  Similarly, the second *Panduit* factor "ensures that any proffered alternative competes in the same market for the same customers as the infringer's product."  *Id.*  When the products are dissimilar, including serving different market segments differentiated by price, the assumption of the second *Panduit* element does not apply.  *Id.*

Mr. Bero further misapplies the market share approach to Panduit's lost profit test by reducing Douglas' ██% market share to ██% <u>without any reasoning or analysis</u> – simply a professed desire to be "reasonable."  To be clear, this challenge is not simply a criticism of Mr. Bero's rationale or attacking the factual underpinnings of his analysis – he has <u>no rationale</u> and <u>no facts</u> underlying his arbitrary ██% market share figure.  In *Kumho*, the Supreme Court, quoting its decision in *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), cautioned that "'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'"  *Id.* at 157.  Mr. Bero's opinion on market share in the hypothetical "but for" world is pure *ipse dixit*.

For these reasons, Mr. Bero's opinion regarding lost profits should be excluded because it fails completely to address the proper methodology for determining lost profits by market share.

### 2. Bero's Methodology for Determining Market Demand for the '700 Patent Is Not Reliable or Helpful to the Trier of Fact

Mr. Bero also fails to tie his lost profits analysis to the actual patented technology. Mr. Bero's analysis of the market demand for the features of the '700 Patent is curiously empty of any evidence regarding the actual technical characteristics of the '700 Patent. Instead, Mr. Bero merely opines that, generally, the attachment/detachment system is important to snowplow users. Mr. Bero makes no attempt to account for what makes *Douglas'* attachment/detachment system valuable, ignoring, among other things, Douglas' own trial testimony that the '935 hydraulic patent (which the jury found Buyers did not infringe), "had a significant impact on the industry as a whole" as part of the "easy on/easy off" Douglas attachment/detachment system. *See* ECF 511, Trial Transcript v. 1-P at 32:20-33:14 (Gary Watson, Direct Testimony). Mr. Bero also ignores the raft of other patents under which Douglas' plow systems are manufactured. *See* Exhibit C, PX 449. He also ignores his own interviews indicating that whatever made Douglas' attachment/detachment systems attractive to purchasers was not the '700 Patent. *See* Exhibit A, Aug. 25, 2010 Bero Report, Schedule 21.0, Interviewees 2, 3, and 5 (accused Buyers plows do not have the benefits of the Douglas plows). More fundamentally, Mr. Bero never attempts to claim that the Douglas-specific attachment/detachment system is the most important feature, or the sole reason why a person would buy a Douglas snowplow.

Instead of specific information regarding the actual market for Douglas' patented technology, Mr. Bero's "evidence" consists of marketing material by Douglas and its competitors with generic descriptions of their attachment/detachment systems, trademarks referencing the various mounting systems of Douglas and its competitors, and a survey he conducted of Douglas and Buyer dealers (the results of which he mostly ignores).

Mr. Bero asked dealers, "When you consider the reasons customers purchase snowplows, is the system for attaching and detaching the snowplow to and from the vehicle an important consideration to purchasers of snowplows?" Exhibit A, Bero Aug. 25, 2010 Report at 33. The question itself was leading and Mr. Bero did not attempt quantify or qualify the relative importance of the feature based on the responses he received. Moreover, the fact that the attachment/detachment system is "important" is not probative of the value of the '700 Patent, let alone the specific independent claim at issue, claim 45. Also, it should be noted that Mr. Bero questioned dealers regarding purchasers' motivations, not the purchasers themselves.

Although an expert may ordinarily testify based on hearsay, the expert testimony still must be based on "firm scientific or technical grounding." *Uniloc* 632 F.3d at 1315; *see Fractus, S.A. v. Samsung*, No. 6:09-cv-203-LED-JDL, 2011 WL 7563820 (E.D. Tex. Apr. 29, 2011). "It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). The patentee therefore "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *Uniloc*, 632 F.3d at 1318 (Fed. Cir. 2011), *quoting Garretson v. Clark*, 111 U.S. 120, 121 (1884).

In *Fractus*, the court excluded testimony by an expert regarding a market demand survey. 2011 WL 7563820 at *1. The plaintiff commissioned two surveys to value "incorporating internal antennas in cell phones in place of external antennas" and "the relative importance of internal antennas in cell phones to consumers." *Id*. The court excluded the surveys because they measured the value of something -- internal vs. external antennas – that was broader than what

was covered by the patents – specific improvements to internal antennas. *Id.* The Court reasoned:

> While Plaintiff claims that its experts contend that the patents-in-suit are 'fundamental' to internal antennas, ***the surveys are not tied to the alleged advantageous technical characteristics of the patents-in-suit…therefore, the surveys do not measure the value of Plaintiff's technology***, but merely measure the perceived consumer value of cell phones with any internal antennas.

*Fractus*, 2011 WL 7563820 *1 (emphasis added). In excluding the evidence because the non-probative survey evidence would confuse the jury, the *Fractus* court explained that "[a]llowing the jury to hear such evidence not tied to the claimed invention risks 'compensation for infringement [that] punishes beyond the reach of the statute.' *Id.* (citation omitted).

Mr. Bero's opinion that the attachment/detachment system is "important" to purchasers is similarly flawed. The fact that some survey respondents agreed that attachment/detachment systems are "important" to consumers is not probative of market demand for the invention claimed in the '700 Patent. In fact, here, Douglas has already testified that the benefits of Douglas' own "easy on/easy off" system are provided by <u>multiple</u> patents (beyond the attachment/detachment patents identified by Mr. Bero) and the other evidence Mr. Bero relies upon for his conclusions regarding the alleged importance of the Douglas attachment/detachment system (trademark, customer recognition) actually speaks to other patents, <u>not</u> the '700 Patent. ECF 515, Trial Transcript v. 3-B at 72:2-25 (Gary Watson).

Accordingly, Mr. Bero's opinion that the attachment/detachment system is "important" to snowplow purchasers is not probative, confuses the issues before the jury, and should be excluded as not helpful to the trier of fact.

## C. Bero's Opinion that a Reasonable Royalty Would Be 11.7% Is Not Reliable or Helpful to the Trier of Fact

"A reliable reasonable royalty calculation depends on trustworthy evidence of both the royalty base and the royalty rate." *IP Innovation L.L.C.*, 705 F. Supp. 2d, at 688-89. In choosing both, the patentee bears the burden of proving that the entire market value rule has been satisfied. *See IP Innovation*, 705 F.Supp.2d at 690; *see also Lucent*, 580 F.3d at 1336 ("the patentee must prove that the patent-related feature is the basis for customer demand." "It is not enough to merely show that the [patented technology] is viewed as valuable, important, or even essential to the use of the [accused product]." *LaserDynamics*, 694 F.3d at 68. Here, Mr. Bero relies on an overly-inclusive royalty base and fails to tie his proffered royalty rate to the actual patented technology.

### 1. Bero's Methodology for Determining the Royalty Base Is Not Accepted or Reliable and Violates the Entire Market Value Rule

Mr. Bero calculated the royalty base against which the reasonable royalty would be applied by adding up Buyers' sales numbers for: (1) the lift frame; (2) the moldboard; (3) the mount; and (4) the lights. *See* Exhibit B, Aug. 25, 2010 Bero Report, Schedules 24.1 & 24.2. In using Buyers' entire snowplow revenue as the royalty base against which his chosen royalty rate should be applied, Mr. Bero assumed that all of Buyers' snowplow revenue for these four different parts of the snowplow assembly was attributable to demand for the patented feature.

The entire market value is based on the idea that "'[w]hen a patent is for an improvement, and not for an entirely new machine or contrivance, the patentee must show in what particulars his improvement has added to the usefulness of the machine or contrivance. He must separate its results distinctly from those of the other parts, so that the benefits derived from it may be distinctly seen and appreciated.'" *Lucent*, 580 F.3d at 1337 (quoting *Garretson v. Clark*, 111

U.S. at 121, 4 S.Ct. 291); *see Oracle Am., Inc. v. Google Inc*., 2011 WL 2976449, at *4,

(N.D.Cal. Jul. 22, 2011) ("The fact that Java may be a critical component of Android does not

justify application of the entire market value rule. Wheels are critical to an automobile, but no

one would apportion all of the demand for a car to just the wheels.").

> In *Cornell Univ. v. Hewlett-Packard Co.*, Chief Judge Rader further explained that:
>
> The entire market value rule in the context of royalties requires adequate proof of three conditions: **(1) the infringing components must be the basis for customer demand for the entire machine including the parts beyond the claimed invention**, ....; (2) the individual infringing and non-infringing components must be sold together so that they constitute a functional unit or are parts of a complete machine or single assembly of parts; .... and (3) the individual infringing and non-infringing components must be analogous to a single functioning unit.

*See Cornell Univ. v. Hewlett-Packard Co.*, 609 F.Supp. 2d 279, 286-87 (N.D. N.Y. 2009)

(Federal Circuit Chief Judge Rader, sitting by designation) (citations omitted) (emphasis added).

Each of these conditions must be satisfied before the entire market value of the Buyers

snowplows can be used as the royalty base. *Id.* "[A]n apportionment is required even where the

accused product is the smallest salable unit or where whatever the smallest salable unit is it is

still a multi-component product encompassing non-patent related features." *Dynetix Design*

*Solutions, Inc. v. Synopsys, Inc.*, 2013 WL 4538210 *3 (N.D. Cal., Aug. 22, 2013) (opinion of

damages expert may be excluded for failure to apportion royalty base); compare with *Rembrandt*

*Social Media, LP v. Facebook, Inc.*, 2013 WL 6327852 at *5 (E.D. Va., December 3, 2013)

(expert apportioned royalty base, although apportionment itself was conducted improperly;

explaining, "an apportionment including value attributable to more features than just the

improvement overcompensates the patentee.").

The sole evidence relied upon by Mr. Bero relates to the "importance" of any type of

attachment/detachment system, generally. This "evidence" is insufficient to apportion the entire

revenue as the royalty base. Under similar circumstances in *IP Innovation*, Chief Judge Rader

explained that "selected users' statements in isolation and without a relationship to the actual claimed technology do not show an accurate economic measurement of total market demand for the switching feature, let alone its contribution to the demand for the entire product asserted as the royalty base." 705 F.Supp. 2d at 690. For the same reasons that the expert opinion in question was excluded in *IP Innovation*, Mr. Bero's opinions must be excluded here.

By including all four parts of the snowplow assembly, Douglas was able to provide the jury with an extremely high number against which to apply Mr. Bero's suggested royalty rate. In the preceding damages trial, Douglas was careful to mention the over-inclusive royalty base multiple times during testimony. *See, e.g.* ECF 510, Trial Transcript v. 3-C at 9:15, 9:20, 25:19, 26:3, 26:5, 26:7, 27:7, 32:7, 36:13 (repeated references to total sales); ECF513, Trial Transcript v. 1-A at 62:16 (reference to Buyers' overall company profit during opening). "Admission of such overall revenues, which have no demonstrated correlation to the value of the patented feature alone, only serve to make a patentee's proffered damages amount appear modest by comparison, and to artificially inflate the jury's damages calculation beyond that which is 'adequate to compensate for the infringement.'" *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012); *see* 35 U.S.C. § 284.

For the foregoing reasons, the Court should exclude Mr. Bero's reasonable royalty opinion because he fails to properly apportion the value of the invention when selecting the royalty base to which his royalty is applied.

### 2. Bero's Methodology for Determining a Starting Royalty Is Not Accepted or Reliable and Violates the Entire Market Value Rule

Mr. Bero derives his starting royalty rate from three different metrics, what he calls a "Market Share Profitability Royalty Rate," a "Pricing Premium Royalty Rate," and a "Profit Premium Royalty Rate." The purpose of these three metrics is to create a back-door through

which Douglas can claim lost profit damages without going through the rigorous causality requirements of the "but for" world. Essentially, Mr. Bero estimates the profit Douglas would have expected to receive and assigns <u>all</u> of that expected profit as a "reasonable royalty" on the '700 Patent to Douglas. Again, Mr. Bero fails to apportion this revenue between the value added by the invention and the value owing to numerous other factors, such as, with respect to Douglas' revenue, the many other features and innovations advertised by Douglas, the other patents owned and licensed by Douglas,[5] and the strength of Douglas' brands and distribution channels and, with respect to Buyers' revenue, Buyers' pricing, brand strength, and its own innovations. See *Rembrandt Social Media*, 2013 WL at *3 and *6 (use of income-based approach must correctly apportion revenue to infringing technology).

Mr. Bero further compounds this error by relying upon a LES NOUVELLES article purporting to measure royalty rates for "innovative" patents versus improvement patents. *See* Aug. 25, 2010 Bero Report at 61-62, citing Stephen Degnan and Corwin Horton, *A Survey of Licensed Royalties*, 91-96 LES NOUVELLES, June 1997. First, there is nothing to suggest that Mr. Bero has any basis, in experience or fact, to conclude that the '700 Patent is a "pioneer" patent. *See supra* at 6-7. Moreover, the survey itself is irrelevant because it is unrelated to the technology at issue in this case, and was <u>excluded for just that reason by the Federal Circuit</u> in *LaserDynamics*. 694 F.3d at 60-61 and 80 (describing survey and noting it should have been excluded). Generic or theoretical royalty rates not tailored to the facts of the case and technology at issue run afoul of *Daubert*. *See Uniloc*, 632 F.3d at 1317; *IP Innovation*, 705 F.Supp. 2d at 691.

---

[5] *See* Exhibit C, PX 449, listing the patents covering the Douglas snowplows.

Mr. Bero's reliance on the 1997 LES NOUVELLES Market Innovativeness Survey to derive any particular royalty rate or apportion his royalty rate between the asserted patents is mere speculation and must be excluded.[6] *See Hynix Semiconductors, Inc. v. Rambus, Inc*., 2006 WL 1991760 (N.D.Cal., July 14, 2006) (rejecting reliance on 1997 LES NOUVELLES survey, "[T]he inclusion of any amount in the royalty rate because the Rambus patents involved 'revolutionary technology' would be the result of speculation.")

It does not matter that Mr. Bero then adjusts the royalty rate based on the *Georgia-Pacific* factors. "Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Uniloc*, 632 F.3d at 1317; *see Dynetix*, 2013 WL 4538210 *5 ("the analysis must be based on industry evidence and must consider the relationship between the patented feature and the accused products to determine a case and party specific starting point.")

For these reasons, the starting royalty rates Mr. Bero uses are not the result of reliable methodology and, therefore, his reasonable royalty opinion must be excluded.

### 3.    Bero's Apportionment of an 11.7% Royalty to the '700 Patent is Arbitrary

Mr. Bero has never provided an independent valuation of the '700 Patent. Rather, he assigned a 15% royalty to the group of three patents he designated as "attachment/detachment patents" and, following remand, simply subtracted the royalty rates granted by the jury from the overall 15%. The royalty by the jury, however, represents the jury's royalty for two specific patents, and not approval of Mr. Bero's original 15% group royalty rate.

---

[6] *See* Buyers' Motion in Limine #20 re: Market Innovativeness Survey, filed concurrently herewith. Buyers' Motion in Limine #20 seeks to separately exclude any reference to or reliance upon the 1997 LES NOUVELLES study.

To the extent he relies on his earlier valuation of 1-2% for the other attachment/detachment patents, Mr. Bero still plucks the 11.7% figure "out of thin air based on vague qualitative notions of the relative importance" of generic attachment/detachment technology and his unqualified opinion that the '700 Patent is a "pioneer" patent. *See LaserDynamics*, 694 F.3d at 69. Moreover, Mr. Bero's testimony at trial, where he assigned the '530 Patent and '978 Patent royalty rates of 1-2%, was based on the inadmissible "Market Innovativeness Survey." *See* ECF 510, Trial Transcript v. 3-C at 31:11-18 (Richard Bero).

Mr. Bero's "complete lack of economic analysis to quantitatively support" the apportionment "echoes the kind of arbitrariness" of the 25% Rule rejected by the Federal Circuit, and alone justifies excluding Mr. Bero's opinion. *Id.* For example, Mr. Bero does not adjust the percentage based on the "significant impact" of the '935 hydraulic patent (that the jury found Buyers did not infringe), which Douglas' Gary Watson testified was part of Douglas' "easy on/ easy off" attachment/detachment system. *See* ECF 511, Trial Transcript v. 1-P at 32:20-33:14 (Gary Watson). Mr. Bero also does not account for the "additional attachment/detachment related patents" owned or licensed by Douglas, which Mr. Bero admits in his report. Exhibit B, Aug. 25, 2010 Bero Report at 8. According to Douglas, anywhere from <u>four to thirteen patents</u> cover its plow systems. *See* Exhibit C, PX 449.

Mr. Bero's reasonable royalty is based on assigning all of Douglas' and Buyers' revenue to the attachment/detachment system, and then apportioning 11.7% to the invention of the '700 Patent, without any economic analysis to quantitatively support that apportionment. Mr. Bero did not do his job as an expert and, thus, his opinion must be excluded.

# IV.    Conclusion

Mr. Bero's opinions on lost profit and reasonable royalty damages are fatally infected by his failure to adduce any evidence shedding light on the value of the patented technology. Mr. Bero's failure to connect his opinions to the facts of this case renders his opinions inadmissible at trial.

Dated: March 14, 2014

Respectfully submitted,

____/s/ Christina J. Moser_____
Thomas H.  Shunk
Email: tshunk@bakerlaw.com
Christina J.  Moser
Email: cmoser@bakerlaw.com
BAKER & HOSTETLER LLP
1900 East 9th Street, Suite 3200
Cleveland, OH  44114-3482
Telephone:216.621.0200
Facsimile: 216.696.0740

Todd R.  Tucker
Email: ttucker@calfee.com
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland OH 44114-1607
Telephone: 216-622-8231
Facsimile: 216-241-0816

Andrew J.  Clarkowski
Email: aclarkowski@axley.com
AXLEY BRYNELSON, LLP
Suite 200, 2 East Mifflin Street (53703)
Post Office Box 1767
Madison, WI 53701-1767
Telephone: 608-257-5661
Facsimile: 608-257-5444
Attorneys for Defendant
BUYERS PRODUCTS COMPANY