IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| DOUGLAS DYNAMICS, LLC, | ) |
| | ) |
| Plaintiff | ) |
| | ) CIVIL ACTION NO. 3:09-cv-00261 |
| v. | ) |
| | ) Hon. William M. Conley |
| BUYERS PRODUCTS COMPANY, | ) |
| | ) |
| Defendant | ) |

**DOUGLAS'S RESPONSE TO DEFENDANT BUYERS' MOTION TO EXCLUDE TESTIMONY OF RICHARD BERO**

Plaintiff Douglas Dynamics, LLC ("Douglas") opposes the motion made by Buyers Products Company ("Buyers") to exclude the testimony of Douglas's damages expert Mr. Richard Bero. (Dkt. 612.)

Despite Buyers' complaints, Mr. Bero's lost profits and reasonable royalty analyses are based on sound economic and factual predicates. He will testify that Douglas lost profits on at least 50% of Buyers' infringing sales based on the well-established market share test, and that Douglas is entitled to receive a reasonable royalty on the remainder of Buyers' infringing sales. His reasonable royalty analysis is fully consistent with his testimony at the first trial. His lost profit analysis follows verbatim the methodology put forth in this Court's standard jury instructions.

Even if Buyers has some legitimate disputes with the facts underlying Mr. Bero's analysis or the weight he places on the relevant facts, exclusion under *Daubert* is improper. It is the jury's role to evaluate the weight to be given to the testimony of dueling qualified experts. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed.Cir.2010). Questions about what facts are most relevant or reliable to calculating damages are for the jury. *Id.*; *see also BASF Corp. v.*

*Aristo, Inc.*, No. 2:07-cv-222 (N.D. Ind. June 29, 2012) (citing *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based.")). "[T]he district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower, Inc. v. Ins. Co. of the State of Pa.*, 732 F.3d 796, 807 (7th Cir. 2013) (citing *Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 766 (7th Cir. 2013); *Smith*, 215 F.3d at 720).

The Federal Circuit instructs that the district court's role under *Daubert* is not to evaluate the correctness of facts underlying an expert's testimony. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F. 3d 1292 ( Fed. Cir. 2011). In *i4i*, 598 F.3d at 845, the Federal Circuit explained that a party's quarrel with the underlying facts used by a damages expert goes to the weight, not the admissibility, of his opinion:

> On appeal, Microsoft ably points out various weaknesses in the damage calculations by i4i's expert. At their heart, however, Microsoft's disagreements are with Wagner's conclusions, not his methodology. *Daubert* and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness. We have consistently upheld experts' use of a hypothetical negotiation and *Georgia-Pacific* factors for estimating a reasonable royalty. See, e.g., *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir.2003); *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed.Cir.2001). Wagner's testimony about the acceptance of the hypothetical negotiation model among damage experts and economists, combined with his methodical explication of how he applied the model to the relevant facts, satisfied Rule 702 and *Daubert*. See *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786. Given Wagner's testimony about his credentials, the district court did not abuse its discretion in finding Wagner qualified to apply the methodology. *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir.2002). Microsoft's quarrel with the facts Wagner used go to the weight, not admissibility, of his opinion.

Mr. Bero's thorough lost profit analysis follows the framework laid out in Federal Circuit precedent[1,2] and far exceeds the evidentiary thresholds for *Daubert*. Likewise, his reasonable royalty analysis is well supported by sound economic data. Douglas is confident that his testimony will hold up on cross examination. Mr. Bero does not employ any tactics designed to confuse or prejudice the jury. Therefore, Buyers' *Daubert* motion should be denied.

## A. Buyers Characterized the '700 Patent as Pioneering in the First Trial

Buyers complains of Mr. Bero's use of the term "pioneering" when describing the commercial value and importance of the '700 patent. Buyers makes this complaint even though its damages expert, Mr. Finger, and its attorneys asserted repeatedly during the first trial and the surrounding proceedings that the pioneering nature of the '700 patent rendered it significantly more valuable than the '530 and '978 patents. (*see, e.g.*, Dkt. 512 at ECF 23, 25, 78; Dkt. 516 at ECF 26.) In fact, during the first trial, Buyers, its expert and Mr. Bero all agreed that the '700 patent was pioneering and commercially more important and valuable than the '530 and '978 patents. (*see, e.g.*, Dkt. 514 at ECF 20, 31, 37; Dkt. 512 at ECF 23, 25, 78; Dkt. 516 at ECF 26.) Buyers even emphasized the pioneering nature of the '700 patent to the jury in opening and

---

[1] The patent statute mandates that damages shall be adequate to fully compensate for the infringement and in no event less than a reasonable royalty. 35 USC §284; *Rite-Hite v. Kelley Co., Inc.,* 56 F. 3d 1538, 1544 (Fed. Cir.1995) (en banc). The general rule for determining actual damages to a patent owner that produces the patented item is to determine the sales and profits lost to the patent owner because of the infringement. *Id*. To recover lost profits, the patent owner must show a **reasonable probability** that, "but for" the infringement, it would have made the sales that were made by the infringer. *Id*. Proving patent damages is not an exact science, and any doubt as to the correctness of the award is resolved against the infringer. *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1576-77 (Fed. Cir. 1989).

[2] A patentee need not negative every possibility that the purchaser might not have bought another product other than his absent the infringement. *State Indus.*, 883 F.2d at 1576-77*; Kaufman Co. v. Lantech, Inc.,* 926 F. 2d 1136, 1141 (Fed. Cir. 1991). A showing under the market share test (or the Panduit rest or the two-supplier market test) permits the jury to reasonably infer that the lost profits claimed were in fact caused by the infringing sales, thus establishing a prima facie case with respect to "but for" causation and sustaining the burden of proving entitlement due to the infringing sales. *State Indus.*, 883 F.2d at 1578-1579; *Rite-Hite*, 56 F. 3d at 1545; *Kaufman*, 926 F.2d at 1141. The onus then shifts to the infringer to show that the inference is unreasonable for some or all of the sales. *Rite-Hite*, 56 F. 3d at 1545.

closing arguments and in post-trial briefing to the Court. (Dkt. 516 at ECF 26; Dkt. 512 at ECF 78; Dkt. 526 at ECF 4, 6, 7, 10, 11, 19.) The effectiveness of Buyers' previous characterization of the '700 patent is reflected, for example, in this Court's Opinion and Order dated February 28, 2012 where this Court characterized the '700 patent as Douglas's pioneering patent in initially denying injunctive relief for the infringement of the '530 and '978 patents. (Dkt. 530 at 1.) Now at a later stage in this litigation, Buyers' new counsel contends that Mr. Bero's testimony should be excluded for characterizing the '700 patent in the same way that Mr. Bero always characterized the patent and, in fact, the same way that Buyers and this Court previously characterized the patent.[3]

Buyers' brief discusses a special legal meaning for the term "pioneer patent" that applies when determining infringement under the doctrine of equivalents, and then argues that Mr. Bero is not qualified to make the determination of whether the '700 patent is a pioneer patent under that specialized legal meaning because he is not an engineer and does not have experience designing snowplows. Of course, Mr. Bero is not testifying on infringement under the doctrine of equivalents, and it is not an issue that will be before the jury. Whether the term "pioneer patent" is used by Mr. Bero or another participant at trial, this alleged concern of potential jury confusion on the doctrine of equivalents should be given no weight.

Mr. Bero is clearly qualified to testify on patent damages, and whether he uses the term "pioneer patent" or not, his analysis of the commercial importance and value of the attachment/detachment patents and the relative importance and value of the '700 patent compared to the '530 and '978 patents is well supported throughout his expert reports and his previous deposition and trial testimony. (*see, e.g.*, Dkt. 295 at ECF 15-17, 37-42, 47-72; Dkt.

---

[3] The Court is referred to Douglas's Motion in Limine No. 15 (Dkt. 644 at ECF 6), where Douglas moves to exclude Mr. Finger's new theory that the '530 and '978 patents drove the purchase of snowplows and that the '700 patent did not drive the purchase of snowplows, as being untimely and contradictory to Mr. Finger's earlier testimony in this case.

660 at ECF 6-11; Dkt. 514 at ECF 13, 19-29.) Further, Mr. Bero, as well as anyone else in this litigation, should be able to use the term "pioneer patent" in the appropriate context. Use of the term is not prejudicial. Indeed, in the seminal *Rite-Hite* case, the majority affirmed a reasonable royalty amount where the district court considered, in part, that the "patent was a 'pioneer' patent with manifest commercial success." 56 F.3d at 1554.

Douglas and Mr. Bero should be entitled to inform the jury at the upcoming trial that Buyers infringed all three attachment/detachment patents and that after the first trial royalty damages were paid for the '530 and '978 patents. The jury will also need to be informed that Mr. Bero testified previously at the first trial that the '700 patent was a pioneering patent and more valuable than the '530 and '978 patents, and that Buyers and its expert agreed at the first trial that the '700 patent was a pioneering patent and more valuable than the '530 and '978 patents. All of this information supports Mr. Bero's analyses proving Douglas's damages by a reasonable probability. *Rite-Hite*, 56 F. 3d at 1545.

### B. Douglas is Entitled to Lost Profits Under the Market Share Test

Despite wide-acceptance of the "market share" test to show lost profits for patent infringement, Buyers motion attempts to discredit Mr. Bero's methodology as arbitrary. This desperate attempt to exclude Mr. Bero's testimony on lost profits should be denied.

#### 1. Mr. Bero's Market Share Estimate is Based on Sound Economic Proof

Buyers disingenuously contends that Mr. Bero "<u>simply notes</u> that Douglas's market share with the infringement is an estimated 60% of the market, and assumes that Douglas would thereby have captured at least 50% of Buyers' sales in the hypothetical market." (Dkt. 612 at 6-7 (emphasis added).) Buyers then alleges that Mr. Bero's estimation of Douglas's market share is somehow incompetent. (Dkt. 612 at 7-9.) Contrary to Buyers' baseless allegations, Mr. Bero's analysis of market share data was thorough and multi-faceted, and his estimates of market share

are reliable and clearly meet the "sound economic proof" standard set by the Federal Circuit. *See, e.g., Ericsson, Inc. v. Harris Corp.,* 352 F. 3d 1369, 1376-1378 (Fed. Cir. 2003).

For example, on page 5 of his report Mr. Bero indicates that Douglas reported to the Securities Exchange Commission in January 2010 that Douglas captured an estimated market share of greater than 50%. (Dkt. 295 at ECF 14.) He also indicated on page 5 and in Schedule 20.0 to his report that Douglas's internal market share analyses indicated that it had approximately a 60% market share of the snowplow market from 2005 to 2009. *Id.* As set forth in Schedule 20.0, this information was provided in Douglas Dynamics' Operating Plans for 2006 to 2010. *Id.* These documents were prepared in the normal course of Douglas's business and not for the purpose of litigation. Mr. Watson and Mr. Janik testified to Douglas's 60% market share value, as well. (*see, e.g.*, Dkt. 511 at ECF 22; Dkt 515 at ECF 12-13.) This evidence alone is enough to satisfy the sound economic proof standard, Rule 702, and *Daubert*. Yet, Mr. Bero also gathered data from other sources to verify the market share estimates. (*See* Schedule 20.1, Dkt. 295 at ECF 191.) Further, in Schedule 20.2, Mr. Bero discloses survey data collected *by Buyers* in 2004 before it began infringing, which found Douglas's market share to be 59.9%. (Dkt. 292 at ECF 192.) Accordingly, the multitude of market data from these various sources when viewed in total provides substantial evidentiary support for a 60% market share value. Based on the totality of information, Mr. Bero concluded reasonably and conservatively that Douglas's market share was at least 50%.

Until this motion, Buyers did not contest Douglas's 60% overall market share. Even Mr. Finger's expert report presumes that Douglas had a 60% overall market share. (Dkt. 306 at ECF 10, 12; Dkt. 662 at ECF 12, 14.) During the first trial there was plenty of evidence and Buyers agreed that Douglas maintained a 60% market share. For example, during post-trial briefing on the injunction issue, *Buyers* argued as follows:

> The entirety of the market encompassing the municipal, commercial and individual use markets for snowplows is approximately 72,000-100,000 plows annually. (Watson 30(b)(6) Depo. at 62:6-63:13, Dkt. 232.) Douglas estimates its market share to be around 60 percent for the years of 2007 through 2009. (Watson 30(b)(6) Depo. 63:14-25; 69:1-10; 69:20-24, Dkt. 232.) These estimates of market share were confirmed by Mr. Watson during his trial testimony. (Trial Transcript Vol. 3B at 42, 69.)

(Dkt. 526 at ECF 16.)

Buyers' present motion now seeks to exclude the testimony of Mr. Bero under *Daubert* for using the same economic information that it has previously argued to be an established fact to this Court. In short, Mr. Bero's use of a 50% market share value is well-supported by sound economic proof, and has already been accepted by both experts, both parties and the Court in this litigation. This baseless argument by Buyers' new counsel should be summarily dismissed.

### 2. Contrary to Buyers' Rhetoric, *BIC Leisure* Does Not Apply

Buyers also misguidedly attacks Mr. Bero's market share analysis under the rationale of *BIC Leisure Products v. Windsurfing International*, 1 F.3d 1214 (Fed. Cir. 1993).[4] Buyers' challenge under *BIC Leisure* fails because there is ample evidence that Buyers competes with Douglas in the market place. *Id.* at 1219 ("Moreover, Windsurfing itself set the value of its patent rights by licensing its technology to nearly every company supplying sailboards in the United States without competing itself in most sailboard submarkets. Windsurfing valued its patent in terms of licensing royalties, not in terms of profits it could make by excluding others from the market.")

*BIC Leisure* does not require a patent owner to conduct a separate price elasticity study where the parties are clearly direct competitors. *Apple, Inc. v. Samsung Elec. Co.*, No. 11-CV-01846-LHK Order re: Motions to Exclude Expert Testimony at Section II.B (N.D. Cal. June 29,

---

[4] *BIC Leisure* holds that the Panduit test operates under the inherent assumption that the patent owner and the infringer sell products sufficiently similar to compete against each other in the same market segment. *BIC Leisure,* 1 F.3d at 1218.

- 7 -

2012).1.  Up to this point in this litigation, Mr. Finger consistently admitted that the Buyers Snowdogg snowplows compete against Douglas's snowplows.  (*See, e.g.*, Dkt. 512 at ECF 34; Dkt. 335 at ECF 11 (Tr. at 41).)  On appeal, the Federal Circuit confirmed that Buyers competes against Douglas.  (Dkt. 568-1 at 10, 13.)  Indeed, the Federal Circuit ruled that **Douglas suffered irreparable harm** from "being forced to compete against products that incorporate and infringe its own patented inventions."  (*Id*. at 12.)

Even though Douglas and Buyers compete for the sale of snowplows for every model of plow that Buyers sells, Buyers argues that its lower selling price alone is sufficient to segment the market and void the time-tested use of the market share method.  Setting aside the fact that the market share analysis already accounts for lower-priced alternatives, selling at a lower price *in competition* with the patent owner does not trigger a *BIC Leisure* exception to the market share method. *BIC Leisure*, 1 F.3d at 1219; *Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1540(Fed. Cir. 1995) (Rader, J., concurring, "[f]inally and perhaps most important, before applying the *Panduit* test, a court must determine whether the accused device competes with the patentee's product in the marketplace."); *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1223 (Fed. Cir. 1995); *Sargent Mfg. Co. v. Cal-Royal Prods.*, No. 3:08-cv-408 (D. Conn. Feb. 24, 2012).[5]

In *BIC Leisure*, the Federal Circuit held that a dramatic price disparity, along with evidence of differing manufacturing processes, board design and marketing channels demonstrated that the patent owner and the infringer did not in fact compete in a unitary market for the same customers. *BIC Leisure*, 1 F.3d at 1219; *Comair Rotron,* 49 F.3d at 1540.  In the case at hand, however, the undisputed evidence shows that snowplows sold by Buyers directly

---

[5]  "In general, an infringer's sales at a lower price do not defeat the patentee's recovery of his losses at the patentee's price, for the principle of patent damages is to return the patentee to the pecuniary position it would have been in but for the infringement." *Pall,* 66 F.3d at 1223.

compete with snowplows sold by Douglas (albeit at a lower price), and the *BIC Leisure* exception does not apply. Accordingly, Buyers' baseless attack under it *BIC Leisure* rationale is properly dismissed.

### 3. **Buyers is Wrong that Lost Profits under Market Share Test Requires Separate Finding of Market Demand for Patented Features**

Finally, with respect to lost profits, Buyers relies on *Uniloc* and *Fractus*[6] to support its flawed argument that Mr. Bero's testimony on lost profits should be excluded because he "fails to tie his lost profits analysis to the actual patented technology."[7] Buyers' argument is flawed because it attempts to apply the rationale of two reasonable royalty cases, *Uniloc* and *Fractus,* to Mr. Bero's use of the well-established market share method of proving lost profit damages.

In contrast to Buyers' erroneous application of these cases, the Federal Circuit repeatedly confirmed that the requisite demand under the first *Panduit* factor is demand for the patented product, and **not** a specific claimed feature (*i.e.*, claim limitation). *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.* 567 F.3d 1314, 1330 (Fed. Cir. 2009); *Presidio Components v. Am. Tech. Ceramics*, 702 F.3d 1351, 1360 (Fed. Cir. 2012). The Federal Circuit explained in *DePuy*:

> All that the first factor states, and thus requires, is "demand for the patented product." *Panduit,* 575 F.2d at 1156. This factor does not require any allocation of consumer demand among the various limitations recited in a patent claim. Instead, the first Panduit factor simply asks whether demand existed for the "patented product" *i.e.*, a product that is "covered by the patent in suit" or that "directly competes with the infringing device." *Rite-Hite Corp. v. The Kelley Co.*, 56 F.3d 1538, 1548-1549 (Fed. Cir. 1995) (en banc).

---

[6] *Fractus, S.A. v. Samsung*, No. 6-09-cv-203 (E.D. Tex. Apr. 29, 2011).

[7] Primarily for the purpose of evaluating reasonable royalties, as noted earlier, Mr. Bero's reports and previous testimony contain thorough analyses of non-infringing alternatives, of customer demand for the features of the attachment/detachment patents, of the relative value of the '700 patent and the '530 and '978 patents and tie the value of the attachment/detachment patents to the patented features. (*see, e.g.*, Dkt. 295 at ECF 15-17, 37-42, 47-72; Dkt. 660 at ECF 6-11; Dkt. 514 at ECF 13, 19-29.)

*See also Apple,* Order re: Motions to Exclude Expert Testimony at Section II.A.8 ("Mr. Wagner's opinion that demand for the patented feature must be addressed under the first *Panduit* factor is contrary to law, and therefore will not assist the trier of fact."). Mr. Finger conceded at his deposition that there is demand for the patented product (Dkt. 335 at ECF 46-47 (Tr. at 178-182)). There should be little or no debate at trial whether the market demand element has been met for the "market share" test.

Further, the law is clear that under the "market share" approach a patent owner may recover lost profits even though acceptable non-infringement substitutes are available from others. *E2Interactive, Inc. v. Blackhawk Network, Inc.*, No. 09-cv-629-slc (W.D. Wis. Dec. 27, 2011); *State Indus.,* 883 F2.d at 1578; *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.,* 246 F.3d 1336, 1354-56. (Fed. Cir. 2001). The purpose of market share analysis is to adequately compensate for the effects that any non-infringing substitutes would have on the patent owners lost profits. *Ericsson,* 352 F.3d at 1378. Accordingly, Mr. Bero met the burden under the appropriate legal standard for proving lost profits using the "market share" test.

C. **An 11.6% Royalty is Entirely Reasonable**

At the upcoming trial, Mr. Bero will testify that a reasonable royalty for the '700 patent is the combined reasonable royalty for the infringed attachment/detachment patents less the royalties that Buyers has already paid for the '530 and '978 patents. His thorough analysis results in a reasonable royalty of 11.6% for infringing snowplows for which lost profits are not awarded.

1. **Entire Market Value Rule is Not Needed**[8]

The royalty base in Mr. Bero's reasonable royalty analysis is Buyers' sales revenue of infringing snowplows. This is the same royalty base that he used in the first trial, and the same

---

[8] The Court is also referred to Douglas response to Buyers' motion in limine number 22.

royalty base used by Mr. Finger, and in fact the same royalty base used by the Court after the first trial. (Dkt. 547 at 6.) Despite common sense and the apparent agreement among everyone involved up to this point in this litigation, Buyers' new counsel contends that Mr. Bero's reasonable royalty testimony should be excluded under *Daubert* for choosing an excessive royalty base.

First, Buyers' reference to the entire market value rule is misplaced. The entire market value rule is not relevant in this case because Douglas and Mr. Bero are not requesting damages on unpatented components, and the requested royalty is based on the "smallest salable patent-practicing unit." *LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F. 3d 51, 67-68 (Fed. Cir. 2012)*; Versata Software, Inc. v. SAP Am., Inc.,* 717 F. 3d 1255, 1268 (Fed. Cir. 2013). The infringed claims are directed to a vehicle-mounted snowplow assembly and the combinations claimed in the infringed claims expressly recite each of the separate components identified by Buyers (*e.g.*, lift frame, moldboard, mount and lights). Further, Buyers competes with Douglas for the sale of vehicle-mounted snowplow assemblies, not separately sold parts, such as lift frames, mounts, moldboards or lights. The fact that Buyers' sales records were produced in the form of component parts does not change the fact that Buyers sells vehicle-mounted snowplow assemblies in competition with Douglas.[9]

Had Douglas and Buyers engaged in hypothetical negotiations prior to the time that infringement began, it is reasonable to conclude that the hypothetically negotiated license would have been for a running royalty of snowplow sales. There is nothing prejudicial or improper with Douglas and Mr. Bero using infringing snowplow assembly revenue as a royalty base.

---

[9] Even if the scope of the claimed invention would have deemed it necessary to apply the entire market rule, the entire market rule would apply because the no components can be used separately. *See, e.g., State Industries*, 883 F.2d at 1580.

There is little doubt that snowplow assembly sales revenue is the most natural and most economically appropriate royalty base in this case.[10]

There is little doubt that snowplow revenue is the most natural and most economically appropriate royalty base in this case. Clearly, even if Mr. Finger did not use the same royalty base, Buyers attack under *Daubert* is misplaced.

### 2. **Mr. Bero Uses Economically Appropriate "Starting Point" Royalty Rate**

Mr. Bero's reasonable royalty analysis identifies three starting point royalty rates, namely, market share profitability, pricing premium and profit premium—three economic metrics. Contrary to Buyers' position, the purpose of these metrics is <u>not</u> to create a back-door through which Douglas can claim lost profit damages without submitting evidence of lost profits. The pricing premium rate corresponds to the difference in price between the infringing snowplows and the patented snowplows sold by Douglas—resulting in a starting royalty rate of 15% or more. The purpose of selecting this royalty rate is to put Douglas on the same playing field with Buyers vis-à-vis pricing to the customer.[11] The profit premium metric (16% or more) focusses on the fact that Buyers was willing to sell it products for a lower profit margin than the Douglas's profit margin. It sets the royalty rate at the difference in profit margin so that the combination of acceptable profit to Buyers and the royalty to Douglas would be no less than Douglas's actual profit margin. The purpose of this metric is to put Douglas's patented products

---

[10] Douglas also incorporates by reference its arguments relating to the royalty base and entire market value rule in its response to Buyers' motion in limine number 22.

[11] As Mr. Bero points out, when faced with a royalty at the time infringement began, Buyers could have chosen to raise it prices to account for the royalty, take less profit or employ a combination of both. (Dkt. 295 at ECF 72.) In fact, in the present case the Federal Circuit has already explained that "[t]he infringer's selling price can be raised if necessary to accommodate a higher royalty rate, and indeed, requiring the infringer to do so may be the only way to adequately compensate the patentee for the use of its technology." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F. 3d 1336, 1346 (Fed. Cir. 2013).

and Buyers' licensed products on an even playing field with respect to profitability. Neither of these metrics is particularly relevant to Douglas's lost profits.

Mr. Bero also considered a Market Share Profitability metric that focusses on the lost profitability to Douglas for licensing to Buyers. This metric resulted in a 27% value, well above Mr. Bero's final 15% reasonable royalty rate. Clearly, Mr. Bero has not assigned all of the expected profit as a "reasonable royalty" as erroneously asserted by Buyers. In any event, whether the parties are in competition and the profitability of the patented products are relevant *Georgia-Pacific* factors. Further, the Federal Circuit sitting *en banc* in *Rite-Hite* expressly approved of a royalty based on expected lost profits in a situation where the patent owner would not have willingly licensed the patent to a competitor, which is the same marketplace situation between Douglas and Buyers. *Rite-Hite*, 56 F.3d at 1554-1555 ("It was not unreasonable for the district court to find that an unwilling patentee would only license for one-half its expected lost profits and that such amount was a reasonable royalty. The fact that the award was not based on the infringer's profits did not make it an unreasonable award.").

Buyers also complains of Mr. Bero confirming the reasonableness of his analysis by referencing the Les Nouvelles report. In *LaserDynamics*, the Federal Circuit held that the Les Nouvelles report was not tied to the patented products involved in the case at hand and therefore ruled that it was not appropriate for the expert in that case to rely on the Les Nouvelles report for a starting point royalty. 694 F.3d at 60-61 & 80. In contrast to the expert in *LaserDynamics*, Mr. Bero did not use the Les Nouvelles report to determine a starting point royalty. Rather, Mr. Bero conducted a thorough analysis of the relevant marketplace for the patented and infringing products and the profitability, pricing, marketing and consumer demand of the products. His starting point royalties are based on economic metrics specifically pertaining to the patented and infringing products. His use of the Les Nouvelles report to confirm the reasonableness of his

analysis is not misleading or improper in any way. In any event, Mr. Bero does not intend to testify on the Les Nouvelles report at trial because it is not used as support for his analysis, but rather as a check to confirm that his analysis is reasonable and proper. (*See* Douglas's Response to Buyers' Motion in Limine No. 20.) As explained above, sound economic factors already demonstrate that this is true.

Mr. Bero conducted a thorough economic analysis to determine appropriate starting point royalty rates and then conducted a full analysis of the *Georgia-Pacific* factors to ensure that he considered a wide array of relevant information. Buyers has not provided any legitimate reason for excluding any of his testimony regarding royalty rate, let alone excluding his testimony all together under the pretense of *Daubert*.

### 3. The 11.6% Royalty is Not Arbitrary

Mr. Bero's reasonable royalty analysis is directed to the commercial value of the three infringed patents, and what royalty rate a willing licensor and willing licensee would have agreed on when the infringement began. (Dkt. 295; Dkt. 660.) He then allocates the value between to the '700 patent and the '530 and '978 patents. (Dkt. 660 at ECF 10-11.) The allocation of value to the '530 and '978 patents is anything but arbitrary—it is the ***exact amount*** that Buyers paid to Douglas pursuant to the first jury verdict, and consistent with Mr. Bero's 2010 trial testimony. The amount allocated to the '530 and '978 patents is hardly plucked out of thin air as asserted by Buyers' counsel. There is nothing inherently misleading or unfair with Douglas or Mr. Bero explaining to the jury that his economic analysis of the three infringed patents leads to a 15% reasonable royalty rate but that Buyers already paid Douglas the equivalent of a 3.4% royalty rate for the infringement of the '530 and '978 patents.

The law does not encourage assessment of reasonable royalties in a vacuum. Buyers infringed all three attachment/detachment patents. Mr. Bero's analysis considers the three patents

that were infringed and the use of those three patents by Douglas and Buyers in the marketplace in order to arrive at his opinion that a fair combined royalty rate is 15%. His opinion is backed by sound economic proof and rationale. His intended testimony on reasonable royalties is not arbitrary, should help the jury determine reasonable royalty damages adequate to compensate for the infringement, and should not be excluded under *Daubert*.

Dated this 28th day of March, 2014.

> Respectfully submitted,
>
> s/Aaron T. Olejniczak
> Aaron T. Olejniczak
> George H. Solveson
> Edward R. Williams, Jr.
> Christopher R. Liro
> Andrus Intellectual Property Law, LLP
> 100 East Wisconsin Avenue, Suite 1100
> Milwaukee, WI 53202
> Phone: 414-271-7590
> Telefax: 414-271-5770
> Email: aarono@andruslaw.com,
> georges@andruslaw.com,
> ewilliams@andruslaw.com,
> chris.liro@andruslaw.com
>
> *Attorneys for Plaintiff Douglas Dynamics, LLC*