IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DOUGLAS DYNAMICS, LLC,

                       Plaintiff,                      OPINION & ORDER

     v.

                                                  09-cv-261-wmc

BUYERS PRODUCTS COMPANY,

                     Defendant.

---

On appeal from this court's original summary judgment decision, the Federal Circuit determined as a matter of law that defendant Buyers Products Company, via its SnowDogg snowplow assemblies, infringed independent claim 45 of plaintiff Douglas Dynamics, LLC's U.S. Patent No. Re. 35,700 "Removable Snowplow Assembly with Pivotable Lift Stand." Accordingly, the court remanded this case for a determination of: (1) infringement of dependent claims; (2) invalidity; and (3) if necessary, damages. *See Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336 (Fed. Cir. 2013). After reviewing the parties' previous briefing on the question of invalidity, this court held that no reasonable jury could find the '700 patent invalid on the record provided. (Mar. 13, 2014 Opinion & Order (dkt. #611).) A jury subsequently awarded Douglas $9,750,000 in damages. (Dkt. #730.) This opinion and order addresses various post-trial motions[1] and directs entry of an amended final judgment in favor of Douglas Dynamics in the amount of $9,935,983.[2]

---

[1] This opinion assumes the reader's knowledge of the background, factual determinations and rulings of law made by this court and the Federal Circuit, which will not be repeated here.

[2] As discussed further below, this award is comprised of the $9,750,000 jury verdict; an award of post-judgment interest on the first verdict of $916; an award of post-verdict royalties totaling $134,400; an award of prejudgment interest on the first verdict of $3,626; and an award of prejudgment interest on the second verdict of $47,041.

OPINION

## I.  Buyers' Motion for Reconsideration of the Court's Summary Judgment Order

### A.  Construction of "Support Frame"

Buyers first asks the court to reconsider its ruling on invalidity by revisiting its construction of the term "support frame."   Specifically, Buyers contends alternatively that: (1) the court improperly gave the term two, materially different constructions, necessitating a finding that the '700 patent is indefinite; (2) applying just the court's first construction and the Supreme Court's recent ruling in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014), the '700 patent is invalid as indefinite;[3] and (3) the court's second construction improperly imports limitations from the specification into the claims.

With respect to the first argument, Buyers contends that the court initially adopted a broad construction of the "support frame" element, defining it as a broader category of "lift frame" capable of supporting other components of a blade assembly, but then narrowed its construction to require that the support frame remain fixed relative to the vehicle in analyzing Buyers' anticipation argument.   The court does not agree.   On summary judgment, this court noted that, contrary to Buyers' argument, the term "support frame" was not insolubly ambiguous (the test at the time for determining indefiniteness).   Rather, the court found that the construction Douglas proposed appeared to be "reasonably certain and accurate," given the context of the remainder of the patent.   The court did not, however, *adopt* that construction.

---

[3] Buyers has moved to file a supplemental brief in support of its motion to alter or amend (dkt. #770), based on the Supreme Court's decision in *Nautilus*.  That motion will be granted, and Buyers' supplemental brief (dkt. #770-1) has been considered for purposes of this opinion.

Upon further analysis of the intrinsic evidence, including the context of the specification, for purposes of an indefiniteness determination, the court ultimately concluded that a reasonable person of ordinary skill in the art would construe a "support frame" to support various components of the snowplow in a fixed position relative to the vehicle.[4]   Thus, the court disagrees with Buyers' contention that it construed "support frame" in multiple, much less inconsistent, ways.

In its second, closely related argument, Buyers contends that because both the "broader" and "narrower" constructions are reasonable, the "support frame" element must be found indefinite under the interpretation of 35 U.S.C. § 112, ¶ 2 as articulated by the Supreme Court in *Nautilus*.  Previously, in analyzing § 112's definiteness requirement, the Federal Circuit had held that claims are indefinite only if they are "insolubly ambiguous." *Nautilus*, 134 S. Ct. at 2130.  In rejecting that formulation of the test, the Supreme Court explained in *Nautilus* that "[t]o tolerate imprecision just short of that rendering a claim 'insolubly ambiguous' would diminish the definiteness requirement's public-notice function and foster the innovation-discouraging 'zone of uncertainty,' . . . against which this Court has warned."  *Id.* (internal citation omitted).  Instead, the Court held § 112, ¶ 2 requires "that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty."  *Id.* at 2129.

---

[4] Buyers contends that neither party ever advanced this construction but admits that Douglas at least articulated the essence of this argument in opposing summary judgment by asserting that the bell crank assembly of the Blau prior art was not a support frame "in accordance with the claims of the 700 patent" because it could not support components that needed to remain stationary during plow operation.

Whether or not the new standard articulated in *Nautilus* proves to be a stricter one in practice,[5] the "support frame" element of the '700 patent meets that standard.   In particular, the specification contemplates a lift frame, and thus the comparable support frame, that remains fixed to the vehicle during plowing and may support other components of the assembly in addition to the lift load.   (*See, e.g.*, U.S. Patent No. Re. 35,700 col.3 ls.24-29 ("While the lift frame remains pivotable relative to the A-frame, the lift frame, during plowing, is fixed to the vehicle so that lights and other accessories which may be mounted on the lift frame remain fixed relative to the vehicle during plowing and during stacking of snow.") (filed Dec. 1, 1995).)   This is enough to inform a person skilled in the art of the scope of the snowplow assembly with reasonable certainty as described in the '700 patent and the context of the specification.

Finally, Buyers argues that the court's construction of "support frame" improperly imported limitations from the specification into the claims by requiring that a support frame remain fixed to the vehicle.   The court again disagrees.   While "there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification," *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998), this court was not "limiting the claimed invention to preferred embodiments or specific examples in the specification."   *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 805 F.2d 1558, 1563 (Fed. Cir. 1986)).   Instead, the court looked to the summary of the invention itself in order to ascertain the characteristics of a "support frame"

---

[5] The Supreme Court noted in *Nautilus* that "[t]he Federal Circuit's fuller explications of the term 'insolubly ambiguous,' . . . may come closer to tracking the statutory prescription." *Nautilus*, 134 S. Ct. at 2130.   Thus, it is unclear at present whether the substance of the law will change in light of the Court's apparent reformulation of the inquiry.

4

in the context of the '700 patent. "It is entirely proper to use the specification to interpret what the patentee *meant* by a word or phrase in the claim." *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) (emphasis added).

To the extent the court also cited to the description of the preferred embodiment as support for its construction, which if done in isolation would be problematic, *see SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc) (plurality opinion), the description of the preferred embodiment merely reaffirms the general description of the *invention as a whole* found earlier in the patent. Similarly, the citation to dependent claim 48, which actually includes a headlamp connected to the support frame, did not *import* that limitation into claim 45. Nor, as Doulas notes, does *any* dependent claim specify that the support frame must remain fixed to the vehicle. Rather than improperly importing limitations into the claims, therefore, the court's construction relied upon the context of the '700 patent as a whole in discerning what a person of ordinary skill in the art would understand a "support frame" to be. Accordingly, the court reaffirms that construction and will deny the motion to alter or amend on this point.

### B. Consideration of the Cicula and Miller References

Buyers again asks the court to reconsider its rulings on summary judgment in light of prior art not presented in its original summary judgment briefing. The court has addressed this argument at least twice before and has rejected it each time. (*See* Nov. 4, 2013 Opinion & Order (dkt. #589) 2-4 (holding that summary judgment would be decided on existing briefing); Feb. 13, 2014 Opinion & Order (dkt. #609) 4-5 (denying reconsideration).) The function of a motion to alter or amend is not to serve as a vehicle to re-litigate previously

argued matters.  *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996).  Buyers' motion, at least as regards this point, does just that.  Accordingly, the court declines to revisit its previous rulings on this question and will deny Buyers' motion for reconsideration.

## II. Buyers' Motion for Judgment as a Matter of Law or for a New Trial

### A. Judgment as a Matter of Law

When reviewing a motion for judgment as a matter of law in patent cases, the trial court is to apply the law of its regional circuit.  *Summit Tech., Inc. v. Nidek Co., Ltd.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004).  In resolving a Rule 50(b) motion for judgment as a matter of law, this court must determine whether the jury had a legally sufficient evidentiary basis for the verdict it reached.  *See May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2012).  In doing so, this court must also "construe the facts strictly in favor of the party that prevailed at trial," *id.* (quoting *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011), including by "drawing all reasonable inferences in that party's favor and disregarding all evidence favorable to the moving party that the jury is not required to believe." *Id.*  Under this standard, Buyers' challenges to the judgment all fall short.

### i.    Lost Profits

As a preliminary matter, Buyers argues that the utter lack of evidence supporting Douglas's lost profits theory meant that those damages were unavailable as a matter of law. In support, Buyers cites to the Federal Circuit's decision in *Wechsler v. Macke International Trade, Inc.*, 486 F.3d 1286 (Fed. Cir. 2007), which reversed the denial of a motion for judgment as a matter of law based on the legal unavailability of lost profits.  Certainly,

Buyers is correct to the extent that the availability of lost profits is indeed a question of law. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1544 (Fed. Cir. 1995) (en banc). Unfortunately for Buyers, however, lost sales of a competing product are legally compensable under 35 U.S.C. § 284. *Id.* at 1546. Moreover, in its reply brief, Buyers *admits* that the parties compete with one another. (*See* Def.'s Reply Br. (dkt. #793) 17.) Although Buyers attacks Douglas's *evidence* on a number of fronts, that is not a reason to preclude the jury from considering lost profits altogether.[6]  Thus, whatever criticisms Buyers may have of Douglas's evidence and methods of proof, it has not shown that lost profits were unavailable as a matter of law.

To recover lost profits, the patentee must establish that but for the infringement, it would have made additional profits. *Wechsler*, 486 F.3d at 1293. One way for a patentee to prove the requisite but-for causation (though not the only way) is by satisfying the four-factor test articulated in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978): (1) demand for the patented product; (2) absence of non-infringing substitutes; (3) manufacturing and marketing capability to support the demand; and (4) the amount of profit it would have made. *See Rite-Hite*, 56 F.3d at 1545. By satisfying this test, the patentee sustains its burden of proving entitlement to lost profits, and "[t]he burden then shifts to the infringer to show that the inference is unreasonable for some or all of the lost sales." *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1219 (Fed. Cir. 1993).

---

[6] In contrast, the Federal Circuit in *Wechsler* concluded that lost profits were unavailable as a matter of law because Wechsler did not produce a product until one year after the infringement period ended, lacked the capacity to do so, and presented no evidence that the infringing sales preempted subsequent sales or eroded the market price once he finally *did* enter the market. *See Wechsler*, 486 F.3d at 1293-94.

Only the second *Panduit* element, is really at issue here.  While Douglas conceded that it could not prove the traditional second *Panduit* element, the Federal Circuit has held that "a patent owner may satisfy the second *Panduit* element by substituting proof of its market share for proof of the absence of acceptable substitutes," as Douglas did at trial. *BIC Leisure Prods.*, 1 F.3d at 1219.  Nevertheless, Buyers contends that Douglas did not offer "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).  Specifically, Buyers argues that Douglas's construction of the hypothetical but-for world ignored:

> (1) the inapplicability of Douglas' historic market share; (2) the impact of market segmentation; (3) the effect of price sensitivity on demand; and (4) the market power of Douglas' reputation and brand loyalty.

(Def.'s Br. Supp. (dkt. #758) 19.)   These failures, in Buyers' view, wholly undermine Douglas's case, such that the jury had no evidentiary basis to award lost profits.

In response, Douglas points out that the jury had substantial evidence on which to base its award of lost profits, including:  Douglas's operating plans; testimony from James Janik and Gary Watson; and the analysis and testimony of its damage expert, Richard Bero. Douglas also points to extensive evidence of product competition and the operation of the market.  Coupled with the highly deferential standard due a jury verdict in the face of a Rule 50(b) motion, the court agrees with Douglas that a reasonable jury had ample proof to find Douglas was entitled to lost profits.

Indeed, the claimed errors on which Buyers now focuses were all points it had the opportunity to challenge before the jury by offering testimony and argument of its own.  For

example, Buyers was free to attempt to prove and argue that its own products occupied a separate market from Douglas's plows due to the price differential (and the related price sensitivity of consumers), just as it was free to prove and argue that Douglas and Buyers competed in separate segments of a market divided between business/homeowner and commercial purchasers.  The jury, however, plainly rejected those arguments, as it did the competing damages theory offered by Buyers' own damage expert, Andrew Finger.

On the issue, the Federal Circuit's decision in *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369 (Fed. Cir. 2003), is instructive:

> [F]ailure to present all of the economic evidence that Harris now identifies does not mean that Ericsson failed to present sound economic evidence.  Harris was entitled to present its own damages theory regarding, for example, how cross-elasticity calculations and second-sourcing would have affected the "but for" market.  It was ultimately up to the jury, however, to weigh the credibility of the parties' opposing theories and evidence. . . . We will not overturn a jury's determination as to the amount of a damages award when, as in this case, that verdict was supported by substantial evidence.

*Id.* at 1378.

Buyers also argues that Bero's market share figure was entirely arbitrary, because he performed no accounting to reduce the *historical* market share of 60% to the 50% figure he ultimately employed.  However, Bero testified that he made the downward adjustment to recognize consumers' price sensitivity in light of the higher prices of Douglas plows.  While Bero was unable to offer a *quantitative* analysis for reaching that figure, the jury could have credited the adjustment he made, particularly in light of information Bero had gleaned from his interviews with eight of the top ten Buyers dealers.  Given the deference the court owes to the jury, the court will not override its decision to credit Douglas's not unreasonable, if

decidedly imperfect, lost profits analysis over Buyers' claim of insufficient proof, especially when it was Buyers' wrongful infringement that created that uncertainty. "The determination of a damage award is not an exact science." *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1327 (Fed. Cir. 1987). It is enough if the evidence "show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Id.* (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)).

### ii.   Direct and Indirect Infringement

Buyers also asks the court to enter judgment of zero dollars in damages based on its contention that Douglas failed to prove indirect infringement at trial. This argument is founded on the underlying premise that Buyers could not have *directly* infringed the '700 patent because all of its claims require a vehicle and Buyers does not sell vehicles. Therefore, Buyers argues, Douglas could *only* prevail on an indirect infringement theory, requiring it to prove *knowledge* of infringement -- recently redefined in the patent context as either actual knowledge of infringement or willful blindness. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068-69 (2011). Since Douglas offered no such evidence to support,[7] Buyers contends that the court must enter an award of zero dollars and require a new trial in which Douglas could attempt to prove *indirect* infringement and related damages.

Buyers has raised this same argument no fewer than three times before: (1) a motion for leave to file a supplemental brief regarding non-infringement (dkt. #594); (2) a motion

---

[7] The evidence of damages offered at trial principally related to sales of Buyers' snowplow assemblies (that is, to *direct* infringement).

in limine seeking to exclude any damages theories regarding indirect infringement due to non-disclosure (dkt. #622); and (3) proposed jury instructions on indirect infringement (dkt. #629).   Each time, the court has rejected this argument on the grounds that the Federal Circuit *directed the entry of a judgment of infringement* on independent claim 45.   *See Douglas Dynamics, LLC v. Buyers Prods. Co.,* 717 F.3d 1336, 1343 (Fed. Cir. 2013) (holding that "the accused products meet every limitation of claim 45 as properly construed"). Buyers' argument is, therefore, rejected for all the reasons previously articulated.  *See Caisse Nationale*, 90 F.3d at 1270 (reconsideration not an appropriate vehicle for rehash of old arguments).

### iii.    Foreign Sales

Buyers next asks the court to enter judgment excluding damages on any sales it made to customers in Canada, because (1) generally, patents do not operate extraterritorially to prohibit infringement abroad; and (2) Douglas never invoked 35 U.S.C. § 271(f), the exception to that general rule, as a source of infringement.   Despite Douglas seeking damages on the alleged sales since its original damage report served on September 24, 2010 (dkt. #295), Buyers failed to raise this issue during the first trial in 2010, nor did it raise the issue in any of the pretrial proceedings on remand.  It was not until midway through the damages trial that Buyers first argued some of Douglas's long-claimed sales could not support a damages award in the United States, at a point when Douglas was in no position to cure any defect.  Assuming without deciding that Buyers may have had a viable argument with respect to these sales, its delay in raising it is unreasonable and prejudicial to Douglas. The court, therefore, declines to take it up now as part of a motion under Rule 50(a).

11

### iv.   Willfulness

Finally, Buyers asks the court to enter judgment in its favor on Douglas's claims of willful infringement, arguing that it did not present evidence at trial to support a finding of willfulness.  As Douglas accurately points out, however, this is because Douglas *abandoned* its claim for willful infringement well before trial.  (*See, e.g.*, Feb. 13, 2014 Opinion & Order (dkt. #609) 6 (agreeing with Douglas that "additional briefing is unnecessary with respect to willful infringement since that claim is no longer being pursued").)  While Douglas is likely precluded from pursuing such a claim elsewhere, *see Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1323-26 (Fed. Cir. 2008) (discussing claim preclusion principles in patent infringement litigation), it makes no sense to enter judgment in favor of Buyers on a claim that was never formally adjudicated.  Accordingly, Buyers' motion for an express judgment on willful infringement will be denied.

### B.  New Trial

Under Rule 59(a), a new trial may be granted "if the verdict is against the clear weight of the evidence or the trial was unfair to the moving party."  *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (quoting *David v. Caterpillar, Inc.*, 324 F.3d 851, 863 (7th Cir. 2003)).  Buyers advances two distinct grounds for a new trial, which the court will address in turn.

### i.   Apportionment of Damages and Instructions

Buyers argues that the jury's royalty award was against the clear weight of the evidence because Douglas failed to present evidence apportioning its damages between the patented features of Douglas's snowplows and the unpatented features.  In a closely related

argument, Buyers contends that this court erred in failing to instruct the jury on proper apportionment, citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011), in which the court held that a patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *Id.* at 1318 (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).[8]

An exception to the requirement of apportionment lies in the "entire market value rule," which "allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for customer demand." *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986); *see also LaserDynamics*, 694 F.3d at 67 (entire market value rule is a "narrow exception" to general rule requiring apportionment).  Buyers argues that Douglas improperly claimed lost profits not just on the linkage mechanism covered by the '700 patent, but on the snowplow assembly as a whole, contrary to the general rule requiring apportionment.  Furthermore, Buyers argues, the jury could not properly have applied the entire market value rule, because the evidence at trial established that the linkage mechanism of the '700 patent does *not* drive customer demand for Buyers' plows.[9]  Finally, Buyers argues that this court prejudicially erred in failing to give instructions on apportionment or on the entire market value rule, both of which Buyers proposed and the court rejected at trial.

---

[8] The same holds true of royalties.  *See LaserDynamics, Inc. v. Quanta Comp., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) ("it is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit'").

[9] In particular, James Janik, President of Douglas Dynamics, testified that the hydraulic system is the "heart" of the Douglas snowplow.

13

Thus, Buyers argues, the jury's verdict improperly awarded Douglas damages for the entire snowplow unit, over its objections and against the clear weight of the evidence, requiring a new trial. This argument rises and falls on a single, central assumption: the linkage mechanism was the only "patented feature" of the '700 patent. As Douglas points out, however, the '700 patent is directed at the *entire snowplow assembly*, not just at the linkage mechanism. (*See* U.S. Patent No. Re. 35,700 (dkt. #1-3).) In contrast, the patent at issue in *LaserDynamics* was directed to a method of optical disc discrimination enabling an optical disc drive to automatically identify the type of disc placed in the drive. 694 F.3d at 56. As a result, the patentee in *LaserDynamics* was not entitled to a running royalty on the total sales of the infringer's *laptop computers*. *Id.* at 60. Likewise, the patent in *Uniloc* was directed to a software registration system to deter software copying, and the accused product was the Product Activation feature of Microsoft's Word XP, Word 2003, and Windows XP programs. 632 F.3d at 1296-97. In that case, the patentee improperly based its royalty calculation on Microsoft's approximate total revenue for Microsoft Office and Windows. *Id.* at 1318. The *Rite-Hite* case similarly involved a patent for a device for securing a vehicle to a loading dock to prevent the two from separating during loading and unloading, 56 F.3d at 1542, while the accused products were dock levelers that were *sold with* the restraints but did not "function together with the patented component in some manner so as to produce a desired end product or result," *id.* at 1550.

In its reply, Buyers argues that Douglas's *claim* in the '700 patent to the entire snowplow assembly does not change the apportionment analysis, because the crux of the invention is the linkage mechanism. For example, in *Dataquill Limited v. High Tech Computer Corporation*, 887 F. Supp. 2d 999 (S.D. Cal. 2011), the court considered patents directed at

handsets with particular features, such as the removal of "access capability" and "optional features such as touch sensitive screens or integrated cameras." *Id.*at 1003.  Although the patents *ostensibly* claimed the entire apparatus, the district court held that the accused products had "multiple features that [were] clearly not claimed by the patents-in-suit, such as the ability to make phone calls and the ability to send and receive text messages." *Id.* at 1027.  In fact, plaintiff later conceded that "the devices have both infringing features and non-infringing features." *Id.*  Thus, even though the patents at issue in *Dataquill* technically claimed the handheld data entry units themselves, *see, e.g.*, U.S. Patent No. 7,139,591 (filed Nov. 21, 2006), the court found the other features *not* covered by the patent required either apportionment or application of the entire market value rule.  *See also In re Innovatio IP Ventures, LLC Patent Litig.*, No. 11 C 9308, 2013 WL 5593609, at *13-14 (N.D. Ill. Oct. 3, 2013) (although claims read onto systems and devices beyond the Wi-Fi chip at issue, the Wi-Fi chips themselves included all the instructions to those devices, meaning the chip was the smallest patent-practicing unit).

This is something of a close question.  On the one hand, the claims certainly cover the entirety of the snowplow assembly, unlike the majority of cases that Buyers cites, suggesting that it would be inappropriate to ignore the value of those claimed elements.  *See ThinkOptics, Inc. v. Nintendo of Am., Inc.*, No. 6:11-CV-455, 2014 WL 2859578, at *2 (E.D. Tex. Jun. 21, 2014) ("While it is sometimes necessary to apportion the smallest salable patent practicing unit to remove the value of unclaimed elements, Nintendo has not cited any precedent permitting the complete removal of the value of *claimed* elements.") (emphasis added).  On the other hand, damages "should not turn on claim draftsmanship such that the owner of an improvement patent may deliberately add dependent claims

directed to unimproved conventional devices to expand the royalty base." *Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Varian Med. Sys., Inc.*, 561 F. App'x 934, 947 (Fed. Cir. 2014).

Ultimately, however, the court concludes that the '700 patent is distinguishable from the patents involved in cases like *Dataquill.* Whether or not the linkage mechanism is the "heart of the invention," the '700 patent is not *only* directed at that mechanism. On the contrary, the patent protects a snowplow assembly that is not only easy to attach and detach, but also retains other desirable characteristics by virtue of the arrangement of its other parts. For instance, the entirety of the assembly can be removed as a single unit, leaving nothing behind on the vehicle, and the A-frame remains upwardly pivotable to allow the user to stack snow. (*See* '700 patent, 1:16-2:27.) The linkage mechanism, *combined* with the rest of the assembly in a particular way, creates an improved snowplow assembly -- and it is Buyers' improved snowplow assemblies, as a whole, that infringe the claims.

Thus, the invention of the '700 patent is more akin to the invention considered by the Federal Circuit in *University of Pittsburgh.* In that case, the patent claimed an "RPM System" adapted for use with a beam generator; one of the claims, claim 38, also included the beam generator itself. *Univ. of Pittsburgh*, 561 F. App'x at 947. The Federal Circuit held that apportionment was not required, because claim 38 did not merely include the beam generator as an "accessory," "it claim[ed] an apparatus where the beam generator and the RPM System operate via a gating signal where one actuates the other. Indeed, the evidence at trial show[ed] that Varian itself . . . acknowledged the value added by the function of the combined apparatus." *Id.*; *see also Rite-Hite*, 56 F.3d at 1550 (requiring apportionment

where patented and unpatented features did *not* function together to create a particular result).

To the extent that claim 38 still added an "unimproved conventional device" to the royalty base, the Federal Circuit also concluded that many of the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), directed the jury to reward the inventor only for the value of the invention. *Univ. of Pittsburgh*, 561 F. App'x at 947-48. Similarly, while the court recognizes that *University of Pittsburgh* is non-precedential and is "fact- and record-specific," *id.* at 950, Buyers has demonstrated neither that it would be appropriate to exclude the claimed assembly from damages, nor that the lack of instruction on apportionment was not ameliorated by the court's *Georgia-Pacific* instruction.

### ii.    Exclusion of the Curtis Settlement Agreement

As it has before, Buyers also challenges the court's exclusion of the Curtis settlement agreement.   Specifically, Buyers objects to the court's application of the *LaserDynamics* decision, in which the Federal Circuit affirmed its "longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages," except under "certain limited circumstances."  694 F.3d at 77 (citing *ResQNet*, 594 F.3d at 870-72).  Unlike the license in *ResQNet,* the Federal Circuit found the settlement in *LaserDynamics* was not "uniquely relevant and reliable," *id.* at 78, as did this court with respect to the Curtis settlement agreement.  While Buyers repeats the contention that this was the wrong "test," it offers no new evidence or argument persuading the court that the Curtis settlement agreement should be admissible in light of the general disapproval of admitting such

17

settlement agreements to establish royalty damages.   The mere fact that it is the *only* example of a "license" available does not make it "admissible and probative."

### III.Douglas's Motion to Alter or Amend

Next, Douglas seeks to alter the judgment to include the following additional amounts:[10]

| | |
|---|---|
| Prejudgment interest on the 2014 verdict regarding the '700 patent | $1,526,100.00 |
| Prejudgment interest on the 2011 verdict regarding the '978 and '530 patents | $71,936.00 |
| Post-judgment interest on the 2011 verdict regarding the '978 and '530 patents | $916.00 |
| Post-verdict royalties for units sold after the 2011 trial | $482,400.00 |
| Attorney's fees relating to the 2011 trial | $463,733.00 |
| Attorney's fees relating to the 2014 trial | $91,794.00 |
| **Total** | **$2,636,879.00** |

Buyers does not object to the calculation of post-judgment interest on the 2011 jury verdict (by far the smallest sum), but does object to Douglas's request for prejudgment interest, post-verdict royalties and attorney's fees, each of which the court takes up below.

### A.  Prejudgment Interest

"In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer

---

[10] Buyers also includes the court costs in its chart of amounts that Douglas seeks to add, but those are properly discussed in the context of the bill of costs, not the motion to alter or amend.

entered into a reasonable royalty agreement." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983).   The award of prejudgment interest in patent cases is governed by 35 U.S.C. § 284.   Since the overriding purpose of that statute is to afford patent owners complete compensation, the Supreme Court explained in *Devex* "that prejudgment interest should ordinarily be awarded." *Id.*   Thus, "prejudgment interest should be awarded under § 284 absent some justification for withholding such an award." *Id.* at 657.

Buyersargues that prejudgment interest is not warranted in this case because Douglas unduly delayed filing this lawsuit.   While the Supreme Court specifically noted that delay can justify the denial of an award of prejudgment interest, *see Devex*, 461 U.S. at 657, the Federal Circuit has since advised that withholding of prejudgment interest based on delay is also the exception, "not the rule," and that "the discretion of the district court is not unlimited" in this respect. *Lummus Indus., Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 275 (Fed. Cir. 1988).   Only where the delay has actually prejudiced the defendant may the court deny prejudgment interest on those grounds. *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1361-62 (Fed. Cir. 2001).

In this case, Douglas first acquired and inspected one of Buyers' snowplows in or around the fall of 2007.   At that time, Douglas claims it performed testing on the plow's mechanical aspects, not on the hydraulic or electric systems, nor did it analyze the plow in relation to its patents.   Even so, Buyers points out that sometime in 2007, Douglas received "verbal information" from its counsel, asking the court to infer that Douglas likely could have sued Buyers at that point, but chose not to do so.   In 2008, Buyers expanded its product line from its single HD/Ex model, adding the MD and VX models, which Douglas claims prompted it to perform additional testing and to investigate the intellectual property

19

issues surrounding those plows.  After what Douglas describes as a "thorough investigation," it filed suit in April of 2009, alleging infringement of five of its patents.  Even then, Buyers contends that Douglas waited until after Buyers had concluded pre-season sales event before serving the complaint.[11]

Buyers claims prejudice by Douglas's decision to delay asserting its intellectual property rights for a full year and a half after the first Buyers plow was made available through distributors.  Because Douglas waited to file suit, Buyers specifically claims it invested substantially in building up its snowplow business and establishing a place for itself in the market.  According to Buyers, Douglas finally filed suit only *after* Buyers made these investments, despite having known all along that it had a viable case for patent infringement.

Assuming this timing to be accurate, the court is not persuaded that a delay of a year and a half is "undue" on the facts of this case.  Indeed, given the stakes, it was not unreasonable for Douglas to have spent a year and a half investigating Buyers' products and comparing them to its various patents in order to determine which patents, if any, Buyers' plows infringed.  In any case, Buyers has presented no evidence that this initial delay was due to more than diligent investigation in light of the large number of patents Douglas has held over the years and the need to ensure its suit was warranted under Federal Rule of Civil Procedure 11.

The fact that Douglas filed suit in April but did not serve Buyers until June has no bearing on this analysis, since Buyers admits Douglas *did* inform it of its intent to enforce its

---

[11] There is no dispute that Douglas *had* sent a letter informing Buyers of the potential infringement on April 30, 2009.

intellectual property rights in the letter of April 30, 2009, around the time Buyers filed suit. Moreover, Buyers was aware of Douglas's products and their presence in the market even before that, given that Douglas was one of its principal competitors. "Generally, prejudgment interest should be awarded from the date of *infringement* to the date of judgment." *Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 800 (Fed. Cir. 1988) (emphasis added). That Douglas sent a letter asserting its intellectual property rights in April of 2009, but did not mention having already filed suit, has no particular bearing on the prejudgment interest period.

Having decided to award Douglas prejudgment interest, the court must now determine how to measure that award. Douglas's damages expert Richard Bero calculated prejudgment interest using the prime rate, compounded monthly, for a total award of $1,598,036. Buyers objects to this method, arguing that it does not put Douglas in the position it would have been in absent the infringement, which is the purpose of awarding interest under § 284. *See Gen. Motors*, 461 U.S. at 655; *Crystal Semiconductor*, 246 F.3d at 1361 ("An award of prejudgment interest serves to make the patentee whole because the patentee also lost the use of its money due to infringement."). Instead, it asks the court to award interest at the Treasury bill rate, compounded annually, to more accurately reflect what Douglas would actually have earned on any royalties and profits it received. The court agrees with Buyers' approach and will, therefore, award prejudgment interest in the amount of $3,626 on the first award and $47,041 on the second award.[12]

---

[12] The court takes these figures from the declaration of Andrew Finger, who calculated interest at the Treasury bill rate, compounded annually. (*See* Andrew Finger Decl. (dkt. #783) ¶ 13 n.13, ¶ 18 n.20.) The court declines to adopt Buyers' recommendation that interest be calculated as if Douglas would have received a reasonable royalty on a deferred payment plan as unnecessary, both because it

### B. Post-Verdict Royalties

Douglas also seeks an award of royalties based on Buyers' infringement of Douglas's U.S. patent nos. 5,353,530 and 6,944,978.  After the first trial, the court denied Douglas's motion for a permanent injunction, and instead set an ongoing, reasonable royalty.  The Federal Circuit reversed the denial of the injunction, *and* vacated and remanded the determination of the royalty rate for post-trial sales based in part on reliance on the now-discredited 25% rule.  *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1343-46 (Fed. Cir. 2013).  Meanwhile, Buyers apparently sold off the remainder of its infringing inventory, totaling 1,206 units sold post-verdict.

Douglas now asks the court to award a royalty rate of $400 for each unit sold post-verdict, or about 14% of Buyers' average unit sales price over this period.  Douglas contends that this rate is reasonable because Buyers knew full well that these units infringed but elected to sell them anyway, rather than designing a non-infringing alternative.  At a minimum, Douglas argues, this makes Buyers' post-verdict sales willful, justifying enhancement of any hypothetically negotiated royalty to $400/unit.  *See SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1385 (Fed. Cir. 2013) (affirming district court's decision to award enhanced damages for willful post-verdict sales even where plaintiff did not pursue a willfulness claim at trial).

Buyers argues that because the jury made its own determination of a reasonable royalty rate in awarding damages on the '530 and '978 patents, the court must employ the

---

is not a typical term to a negotiation and overly complicates the calculation of a relatively small interest payment compounded annually.

same rate in calculating any post-verdict royalties.  The Federal Circuit "easily dispose[d]" of that very argument in *Amado v. Microsoft Corp.*, 517 F.3d 1353 (Fed. Cir. 2008).

> On the other side of the dispute, Microsoft argues that the district court was entitled to award Amado no more than $0.04 per infringing unit, the amount the jury found to be a reasonable royalty.  We easily dispose of this argument as well. The jury's award of $0.04 per unit was based on Microsoft's infringing conduct that took place *prior to the verdict*.  There is a fundamental difference, however, between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement.  *Cf. Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1317 (Fed. Cir. 2007) ("[P]re-suit and post-judgment acts of infringement are distinct, and may warrant different royalty rates given the change in the parties' legal relationship and other factors.") (Rader, J., concurring).  Prior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty. Once a judgment of validity and infringement has been entered, however, the calculus is markedly different because different economic factors are involved.

*Id.* at 1361-62 (emphasis added).

Buyers alternatively argues that Douglas's suggested royalty is founded on the faulty premise that infringement occurred post-verdict, when in fact that linkage was "already made" at the time the verdict issued.  *See* 35 U.S.C. § 271(a) ("whoever without authority makes . . . any patented invention . . . infringes the patent").  In particular, Buyers argues that it was reasonable to assume that already-manufactured units would be subject to the same royalty rate as the earlier sales, pointing to various district courts that have awarded supplemental damages at the jury rate for other periods of infringement.  *See, e.g., Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd.*, 833 F. Supp. 2d 333, 347 (E.D.N.Y. 2011) ("Courts routinely grant motions for a further accounting where the jury did not consider certain periods of infringing activity *post*-verdict.").  The *Metso* court cites other cases

holding similarly, but *none* supports Buyers' argument that the "further accounting" should adopt the same royalty rate as applied by the jury to pre-verdict sales. *Id.* Indeed, the *Metso* court itself noted that the "reasonable royalty rate to be applied to the Defendants' post-verdict sales is not necessarily the same as the reasonable royalty that was applied to the Defendants' pre-verdict sales" and set a briefing schedule to determine the appropriate post-verdict royalty rate. *Id.* at 348 (citing *Amado*, 517 F.3d at 1361).

The only other case Buyers cites that arguably supports applying a jury's pre-verdict royalty to post-verdict sales is *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951 (N.D. Cal. 2009). Even in that case, however, the court recognized that "a royalty rate should evolve to track the change in the relationship between the parties caused by the progress of the litigation." *Id.* at 965 (citing *Amado*, 517 F.3d at 1362). Thus, Buyers' argument that an award of post-verdict royalties *must* be limited to the jury's determination of a reasonable, pre-verdict royalty rate has no merit.

More persuasive is Buyers' argument that Douglas's royalty calculation includes double-counting, because Douglas was likely granted lost profits by the jury on half of the old-design units in its inventory by virtue of the jury's damage award in the second trial through April 15, 2011. Douglas objects that Buyers improperly speculates as to the composition of the jury's verdict, pointing out that the jury returned a general verdict without apportioning damages between lost profits and royalties, although Buyers' breakdown of the jury's likely calculations of lost profits and royalties is far more persuasive. (*Compare* Declaration of Andrew D. Finger (dkt. #783), ¶¶ 34-38, *with* Reply Brief In Support of Douglas's Motion to Amend (dkt. #790) p. 20 & n.8.) Indeed, Douglas's request at trial for lost profits on 50% of Buyers' infringing sales and its more detailed

24

defense of the jury's damage award in response to Buyers' renewed motion for judgment or new trial, strongly support Buyers' reading of the award's composition.  (Dkt. #775, pp. 8-13.)

Moreover, the court adopted a general damage verdict that was almost verbatim what Douglas and Buyers both proposed.  (*Compare* dkts. ##630 & 635 *with* dkt. #730.)  To the extent that Douglas sought a lost profits award for 50% of the units sold, it cannot now seek to add to that amount a royalty award on those same units without subjecting Buyers to a substantial risk of double counting.  Accordingly, all units sold through April 15, 2011, and claimed for lost profits at trial fall outside the court's award for post-verdict royalties. Douglas does not dispute Buyers' assertion that this would leave 672 units eligible for enhanced royalties.

Finally, Buyers objects to the calculation of Douglas's proposed royalty rate.  In support, Buyers rehashes its "smallest salable infringing unit" argument in hopes of narrowing the appropriate royalty base, an argument that the court has considered and rejected on multiple occasions, including earlier in this opinion.  Buyers also contends that any royalty rate should be limited to its cost of altering the manufactured lift frames to include a non-infringing linkage mechanism, since Buyers would not rationally negotiate a royalty that exceeds the $100-per-assembly cost to Buyers of retrofitting its already-manufactured assemblies, much less a royalty rate of $400 per assembly sought by Douglas. Accordingly, Buyers asks the court to consider this practical constraint on any royalty negotiation as an "additional economic factor[] arising out of the imposition of an ongoing royalty."  *Paice*, 504 F.3d at 1315.

In something of a non sequitur, Douglas attempts to bolster its argument that Buyers' alleged replacement cost is irrelevant by quoting the Federal Circuit's statement on appeal that the reasonable royalty rate is intended to "compensate the patentee for the use of its technology." *Douglas Dynamics*, 717 F.3d at 1346.  Of course, the cost of replacing an infringing unit with a non-infringing alternative can be an important factor in arriving at a reasonable royalty.  *See Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1372-73 (Fed. Cir. 2008) (district court did not err in reducing royal rate to reflect that infringer probably could have designed an acceptable alternative), *mandate recalled and amended on other grounds*, 557 F.3d 1377 (Fed. Cir. 2009).   More persuasive is Douglas's argument that the willfulness of the post-verdict sales justifies enhancing a hypothetically-negotiated rate.  *See* 35 U.S.C. § 284.  Even granting Douglas the benefit of that enhancement, however, the court agrees that a royalty of $400 per unit is unreasonable.  Instead, after considering all factors leading the parties to negotiate a reasonable royalty -- including the certainty of selling a non-infringing product under a valid license and Douglas's strong incentive to deny a competitor a license at any price -- the negotiated, post-verdict royalty rate would be $200 per unit.  This leaves a total royalty award on 672 units of $134,400.

### C. Attorney's Fees

Finally, Douglas requests an award of additional attorney's fees for: (1) establishing infringement of the '530 and '978 patents; and (2) responding to Buyers' repeated, post-appeal attempts to re-litigate liability with respect to the '700 patent.   Under 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing

party."[13]  While this standard used to require "material [and] inappropriate conduct related to the matter in litigation," *Brooks Furniture Mfg., Inc. v. Dutailer Int'l, Inc.*, 393 F.3d 1378, 1381 (2005), the Supreme Court recently held in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014) that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.* at 1756.  In formulating this standard, the Supreme Court expressly rejected the Federal Circuit's standard as "overly rigid" and "inherently inflexible," and concluded that district courts could award fees even where unreasonable conduct was "not necessarily independently sanctionable." *Id.* at 1756-57.  Accordingly, the court briefly considers each of Douglas's fee requests applying the *Octane Fitness* standard.

###    i.   Infringement of the '530 and '978 Patents

Douglas first asks for fees related to establishing infringement of the '530 and '978 patents, arguing that neither was reasonably debatable.  As a preliminary matter, Buyers objects wholesale to this request on the grounds that Douglas purportedly released its claim for fees in exchange for an early payment of the judgment.  In particular, Buyer relies upon the following letter from George Solveson, one of Douglas's attorneys, addressed to one of Buyers' counsel, Todd Tucker , leading up to that payment.

> Pursuant to your recent e-mail, Buyers has decided to pay Douglas the $1+ million relating to the '530 and '978 patents in exchange for a release from Douglas.  This is agreeable with Douglas with the reservation that pre-judgment and post-judgment interest and post-verdict royalty will be resolved and

---

[13] While Douglas did not succeed on all its infringement claims, Buyers concedes by its silence, as it must, that Douglas is the "prevailing party" in this matter, having prevailed on infringement and validity for three of its five patents.

> paid at a later time, and provided that the release will not prejudice the further efforts of Douglas to seek damages and/or royalties on the '700 patent and increased post-verdict royalty rates and interest based upon further proceedings.

(Christina J. Moser Decl. Ex. C (dkt. #782-2).)

Douglas responds that this letters "refers only to a "release from Douglas that the trial judgment has been satisfied," pointing out that Tucker's original e-mail uses that specific language.  (*See* Aaron T. Olejniczak Decl. Ex. A (dkt. #774-1).)  Whatever the import of this email exchange, Douglas further argues that the parties agreed only to a release of the judgment, once satisfied, and that there was no meeting of the minds with respect to any potential claim for attorney's fees.

While neither party has provided a copy of an actual or even a draft "release," Douglas cites to the satisfaction of judgment actually filed with the court on September 21, 2012, which states only that:

> On November 23, 2012[14] judgment was entered in favor of plaintiff Douglas Dynamics, LLC in the amount of $1,018,248 in damages for pre-verdict infringement of U.S. Patent Nos. 5,353,530 and 6,944,978 ("the Judgment") in the above-entitled action.  Without waiving any right to seek any additional damages or recourse from Defendant that this Court and/or any Court of Appeals may award in this litigation for still-pending issues that are not satisfied by the Judgment, Plaintiff acknowledges that on August 29, 2012 defendant Buyers Products Company satisfied the Judgment.

(Satisfaction of Am. J. (dkt. #567) 1.)

The court finds the parties did not agree to release any potential claim for fees in light of the context provided by:  Tucker's original e-mail; a complete dearth of any mention of a claim for attorney's fees, one way or the other, in the e-mail exchanges; the failure of

---

[14] This appears to be an error, as the amended judgment was entered on November 23, 2011.  (*See* dkt. #562.)

the parties to enter into any kind of formal release agreement typical in such instances (particularly when certain claims are unquestionably preserved by the parties); and, most importantly (in the absence of any definitive final release language), the language of the satisfaction of judgment.  In particular, given that Tucker originally referred only to a release "that the trial judgment has been satisfied," the court is unwilling to construe Solveson's later mention of a "release" more broadly, encompassing not only the judgment but also possible claims for fees that went unmentioned by both sides, notwithstanding Solveson's subsequent "reservation" for pre- and post-verdict interest on that judgment.

Next, Buyers argues that this is not an exceptional case.  First, Buyers quotes this court's previous findings that its positions were not "objectively baseless" in the course of resolving Douglas's claims for willful infringement.  *See Douglas Dynamics, LLC v. Buyers Prods. Co.*, 747 F. Supp. 2d 1063, 1113 (W.D. Wis. 2010) ('530 patent: "the claim language was susceptible to Buyers' reasonable construction and acceptance of that construction at must would have led to a finding of noninfringement"; '978 patent: "Buyers' infringement could not have been the result of objective recklessness with these unanswered questions floating about").  Second, Buyers attributes the need for litigation of this matter to Douglas's "outrageously high damages positions and unreasonable settlement positions." (Def.'s Br. Opp'n (dkt. #780) 15.)

Douglas argues that Buyers mistakenly refers to the "objectively baseless" standard as precluding this court's finding of an exceptional case, contrary to the holding in *Octane Fitness*.  Certainly, the Supreme Court held in *Octane Fitness* that conduct need not be independently sanctionable in order to justify an award of fees as an exceptional case.  134

29

S. Ct. at 1756-57.  However, in this court's view, the circumstances that Douglas presents do not rise to the level of being "exceptional" under the *Octane Fitness* standard either.

Buyers took objectively reasonable litigation positions on infringement of the '530 and '978 patents.  It was also objectively reasonable for Buyers to defend the litigation on the grounds that it believed those patents to be invalid, particularly given the crowded field of patents for snowplows and snowplow attachments.  Indeed, Buyers' claims of invalidity with respect to the '530 patent survived summary judgment and went to trial.  *See Douglas Dynamics, LLC v. Buyers Prods. Co.*, 745 F. Supp. 2d 876 (W.D. Wis. 2010).  The mere fact that Buyers chose not to appeal the infringement findings with respect to those two patents, electing instead to redesign its assembly, is not enough to render this case "exceptional." There are myriad reasons an infringer could elect not to appeal this court's findings; the court declines to infer that Buyers' decision here suggests knowledge that it had no defense to Douglas's claims of infringement of the '530 and '978 patents from the outset of suit.

### ii.    Re-Litigation of '700 Patent

Douglas's second request for fees relates to Buyers' multiple attempts to re-litigate the Federal Circuit's finding of infringement of the '700 patent, which presents a far more unusual set of circumstances than the first.  As a preliminary matter, it is not clear that dividing a single lawsuit into litigation stages and individual patents for purposes of assessing whether a case is "exceptional" is appropriate, although neither party really addresses this question.  Buyers implicitly argues for a broader, holistic look at the case by making reference to its conduct throughout the litigation, while Douglas understandably would focus solely on Buyers' position on remand.  Douglas's position seems somewhat at

odds with the text of the statute itself, which speaks of exceptional *cases*, not exceptional claims or instances of conduct.  Douglas's position also seems somewhat at odds with the *Octane Fitness* prescription that the court "consider[] the totality of the circumstances" in assessing whether a case is exceptional.  134 S. Ct. at 1756.

That being said, Douglas makes a reasonable argument that Buyers went far beyond making a record with respect to its efforts to obtain reconsideration of previous rulings that in this court's repeated view had become law of the case, as discussed in the earlier sections of this opinion.  As a result, Douglas was also forced to respond to the same arguments repeatedly before and after trial, which unnecessarily prolonged what is an already long, drawn-out case, particularly in this district.  While it might not be independently sanctionable, Buyers' method of litigation, particularly with respect to the settled question of infringement on remand, arguably stands out as "exceptional" under the standard articulated in *Octane Fitness*.  Tellingly, Buyers does not respond directly to the objections Douglas raises to its conduct regarding the '700 patent litigation on remand, instead focusing on the reasonableness of the rest of its behavior.

Still, the infringement issues were side ones on remand, and Douglas's responses quickly became a simple rote.  Accordingly, the court finds this conduct (while excessive) does not by itself move this case into the exceptional category in this respect, and it will deny Douglas's request for fees incurred on remand.

ORDER

IT IS ORDERED that:

(1) plaintiff Douglas Dynamics, LLC's motion to alter or amend (dkt. #749) is GRANTED IN PART and DENIED IN PART consistent with the opinion above;

31

(2) defendant Buyers Products Company's motion to alter or amend (dkt. #755) is DENIED;

(3) defendant's motion for judgment as a matter of law (dkt. #757) is DENIED;

(4) defendant's motion for leave to file a supplemental brief in support of its motion to alter or amend (dkt. #770) is GRANTED; and

(5) the clerk of court shall enter a final judgment in favor of Douglas Dynamics in the amount of $9,935,983.

Entered this 31st day of December, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge